## SCHRIMPSCHER *v.* STOCKTON.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 19. Argued November 22, 1901.—Decided January 6, 1902.

The deed of an Indian, who has received a patent of land providing that it should never be sold or conveyed by the patentee or his heirs without the consent of the Secretary of the Interior, is void, and the statutes of limitation do not run against the Indian or his heirs so long as the condition of incompetency remains; but where it appeared that by treaty subsequent to the deed, all restrictions upon the sales of land by incompetent Indians or their heirs, were removed, it was *held* that from this time the statute of limitations began to run against the grantor and his heirs.

Even if Indians while maintaining their tribal relations are not chargeable with laches, or failure to assert their claims within the time prescribed by the statutes, they lose their immunity when their relations with their tribe are dissolved and they are declared to be citizens of the United States.

A deed, valid upon its face, made by one having title to the land, and containing the usual covenants of warranty, when received by one purchasing the land in good faith, with no actual notice of a defect in the title of the grantor, constitutes color of title; and in Kansas, possession without a paper title seems to be sufficient to enable the possessor to set up the statute of limitations.

The fact that the Secretary of the Interior might thereafter declare the deed to be void, does not *ipso facto* prevent the statute from running.

THIS was an action of ejectment brought in the Court of Common Pleas of Wyandotte County, Kansas, by John Schrimpscher and about forty others, heirs of one Carey Rodgers, deceased, a Wyandotte Indian, against John S. Stockton and ten others, to recover a tract of land which had been allotted to certain Wyandotte Indians under the treaty of 1855.

Answers were filed by three of the defendants, containing general denials of the allegations of the petition, and pleas both of a three-year and a fifteen-year state statute of limitations.

To these answers plaintiffs filed a reply to the effect that the ancestor of the plaintiffs, from whom they derived title by descent, was an incompetent Indian, and classed as such under the treaty between the United States and the Wyandotte tribe of Indians, concluded January 31, 1855, and, as such incompetent, was prohibited from alienating any of the lands in controversy, except only the power to lease the same for the term of two years; that defendants and those under whom they claim were bound by the same prohibition, and could have acquired nothing further than such leasehold interest in the land; that defendants occupied such lands in subordination to the rights of plaintiffs' ancestor, and that no notice had ever been brought home to plaintiffs of an adverse claim by defendants.

A jury having been waived and the case submitted to the court, judgment was rendered for the defendants. An appeal was taken to the Supreme Court of the State, which affirmed the judgment of the lower court. 58 Kan. 758. Whereupon plaintiffs sued out a writ of error from this court.

*Mr. William M. Springer* for plaintiffs in error.   *Mr. James M. Mason* and *Mr. Charles H. Nearing* were on his brief.

No appearance for defendants in error.

MR. JUSTICE BROWN delivered the opinion of the court.

This case turns upon the proper construction of article XV of a treaty with a number of tribes of Indians, including " certain Wyandott," concluded February 23, 1867, and proclaimed October 14, 1868.   15 Stat. 513, 517.

The facts of the case are substantially as follows:

On January 31, 1855, 10 Stat. 1159, the United States entered into a treaty with the Wyandott Indians, by the *second* article of which they ceded to the United States certain lands purchased by them of the Delawares, the object of which cession was that "the said lands shall be subdivided, assigned and reconveyed, by a patent, in fee simple, in the manner hereinafter provided for, to the individuals and members of the Wyandotte Nation, in severalty."   By the *third* article, provision was made for a survey of the lands, the appointment of commissioners to divide the lands among the individuals of the tribe, and to make up lists of all the individuals and members of the tribe, "which lists shall exhibit, separately, first, those families, the heads of which the commissioners, after due inquiry and consideration, shall be satisfied are sufficiently intelligent, competent and prudent to control and manage their affairs and interests, and also all persons without families; second, those families, the heads of which are not competent and proper persons to be entrusted with their shares of the money payable under this agreement; and third, those who are orphans, idiots or insane."   Article *four* provided for the issue of unconditional patents in fee simple to those reported by the commissioners to be competent to be intrusted with the control and management of their affairs and interests; "but to those not so competent, the patents shall contain an express condition that the lands are not to be sold or alienated for a period of five years; and not then, without the express consent of the President of the United States first being obtained," etc.

Margaret C. Cherloe was a Wyandotte Indian of the competent class, and as such she was given, under the treaty of 1855, allotment No. 42, to sixty-four acres of the land originally sued for, and received a patent therefor in fee simple, without restriction as to conveyance. This patent was dated June 1, 1859.

After the issue of such patent, and prior to August 31, 1863, Margaret C. Cherloe died intestate, leaving her grandson, Carey Rodgers, as her only heir at law, and on August 31, 1863, the said Carey Rodgers made a deed in fee simple of the land so inherited to Jesse Cooper and Mary E. Stockton.

Carey Rodgers, being himself a Wyandotte Indian, belonging to the incompetent class by reason of being an orphan, was given allotment No. 278, containing fifty-seven acres, and on September 1, 1859, received a patent for said lands, containing the following condition: " That the said tract shall never be sold or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior for the time being, and with the further and express condition, as specified in the fourth article of the treaty with the Wyandottes of the 31st of January, 1855, that the lands are not to be sold or alienated for a period of five years."

On November 15, 1864, the said Carey Rogers executed a deed in fee simple of this last-mentioned land to Jesse Cooper and Mary E. Stockton, covenanting that he was seized in fee simple and had good right to sell the same.

On February 25, 1869, by a partition of that date by Jesse Cooper and his wife, and Mary E. Stockton and her husband, there was conveyed to Mary E. Stockton the lands sued for in this action and described in the petition. Defendants took title from her.

The said Carey Rodgers died intestate in December, 1867, at the age of 21.

Immediately after the execution of the deeds from Carey Rodgers to Jesse Cooper and Mary E. Stockton the grantees took possession of all the land described in said deeds under claim of title and ownership by virtue of said deeds; made permanent improvements thereon, and they and their grantees have

had and held open, undisturbed and adverse possession of all of said lands, claiming title thereto, paid all taxes, cleared the land of timber, and cultivated the same as tenants.

In the years 1891 and 1892 there was a kind of occupancy of part of the land by persons claiming under the plaintiffs, but that does not seem to have been treated as material.

Carey Rodgers thus became possessed of two tracts of land, one of sixty-four acres as the heir at law of his grandmother, Margaret C. Cherloe, and the other of fifty-seven acres as a personal allotment to himself. As plaintiffs state that a settlement of the case has been made so far as relates to the Cherloe tract, we shall dismiss that tract from our opinion. The deed of Carey Rodgers' own allotment of November 15, 1864, was clearly void, since as to this contract, at least, he was incompetent, and took under a patent which provided that the land should never be sold or conveyed by the grantee or his heirs, without the consent of the Secretary of the Interior. If the case stood upon defendants' rights under this deed alone, there could be no doubt whatever that Rodgers' heirs were entitled to the land.

But on February 3, 1867, another treaty was concluded (proclaimed October 14, 1868) with several tribes of Indians, among which were "certain Wyandottes," 15 Stat. 513, the fifteenth article of which was as follows:

"ART. 15. All restrictions upon the sales of lands assigned and patented to 'incompetent Wyandottes' under the fourth article of the treaty of one thousand eight hundred and fifty-five, shall be removed after the ratification of this treaty, but no sale of lands heretofore assigned to orphans or incompetents shall be made under decree of any court, or otherwise, for or on account of any claim, judgment, execution or order, or for taxes, until voluntarily sold by the patentee or his heirs, with the approval of the Secretary of Interior; and whereas, many sales of land belonging to this class have heretofore been made contrary to the spirit and intent of the treaty of one thousand eight hundred and fifty-five, it is agreed that a thorough examination and report shall be made under directions of the Secretary of the Interior, in order to ascertain the facts relat-

ing to all such cases, and upon a full examination of such report, and hearing of the parties interested, the said Secretary may confirm the said sales, or require an additional amount to be paid, or declare such sales entirely void, as the very right of the several cases may require."

This article makes the following distinct provisions:

1. It removes all restrictions upon the sales of lands patented to incompetent Wyandottes, which should thereafter be made.

2. It provides that no sales of lands theretofore assigned to incompetents shall be made under any legal proceedings, or for taxes, until voluntarily sold by the patentee or his heirs, with the approval of the Secretary of the Interior.

3. That, as to lands theretofore sold by incompetents in violation of the treaty of 1855, a thorough examination and report shall be made under the directions of the Secretary of the Interior, in order to ascertain the facts relating to such cases, and upon examination of such report and a hearing of the parties, the Secretary may confirm such sales, require an additional amount to be paid, or declare the sales void.

No action was ever taken under the third clause to procure a confirmation by the Secretary of the Interior of the deed by Rodgers of November 15, 1864, so that, at the time the treaty of 1868 was ratified, the possession of the lands was in the defendants or their grantors holding adversely to the heirs of Rodgers, but the title still remained in such heirs by reason of the fact that his deed to Cooper and Stockton was void, and no proceeding had been taken under the third clause of Art. XV to confirm or validate it. But although the treaty of 1855 and the patent to Rodgers had expressly provided that there should be no alienation by the grantee *or his heirs*, the treaty of 1868, which took effect after his death, removed all restrictions upon alienations which should thereafter be made, either by the incompetent grantee Rodgers, or his heirs, who thereafter held an alienable title, and were bound to assert such title within the time specified by the statute of limitations, although no title could be gained by adverse possession so long as the land continued to be inalienable by Rodgers and his heirs. *McGannon* v. *Straightlege*, 32 Kan. 524; *Sheldon* v. *Donohue*, 40 Kan. 346.

Their disability terminated with the ratification·of the treaty of 1868. The heirs might then have executed a valid deed of the land, and possessing, as they did, an unincumbered title in fee simple, they were chargeable with the same diligence in beginning an action for their recovery as other persons having title to lands; in other words, they were·bound to assert their claims within the period limited by law. This they did not do under any view of the statute, (whether the limitation be three or fifteen years,) since it began to run at the date of the treaty, 1868, and the action was not brought until 1894, a period of over twenty years.

Plaintiffs, however, seek to avoid the effect of the statute by insisting, first, that statutes of limitations do not run against Indians; second, that defendants were not in possession under color of title, and therefore the statute is not available to them; third, that no title by limitation could be acquired as against the right of the Secretary of the Interior to investigate and declare the conveyance in question to be void, and hence the statute would not begin to run until after such action by the Secretary.

1. Conceding, but without deciding, that so long as Indians maintain their tribal relations they are not chargeable with laches or failure to assert their claims within the time prescribed by statutes, as to which see *Felix* v. *Patrick,* 145 U. S. 317, 330; *S. C.,* 36 Fed. Rep. 457, 461; *Swartzel* v. *Rogers,* 3 Kansas, 374; *Blue Jacket* v. *Johnson Co.,* 3 Kansas, 299; *Wiley* v. *Keokuk,* 6 Kansas, 94; *Ingraham* v. *Ward,* 56 Kansas, 550, they would lose this immunity when their relations with their tribe were dissolved by accepting allotments of lands in severalty. Now, the very first article of the treaty of 1855 provides: " Art. 1. The Wyandotte Indians having become sufficiently advanced in civilization, and being desirous of becoming citizens, it is hereby agreed and stipulated that their organization and relations with the United States, as an Indian tribe, shall be dissolved and terminated on the ratification of this agreement; except so far as the further and temporary continuance of the same may be necessary in the execution of some of the stipulations herein; and from and after the date of such ratification,

the said Wyandotte Indians, and each and every of them, except as hereinafter provided, shall be deemed, and are hereby declared to be citizens of the United States, to all intents and purposes; and shall be entitled to all the rights, privileges and immunities of such citizens; and shall in all respects be subject to the laws of the United States, and of the Territory of Kansas, in the same manner as other citizens of said Territory; and the jurisdiction of the United States, and of said Territory shall be extended over the Wyandotte country in the same manner as other parts of said Territory." There was an immaterial exception not necessary to be noticed here.

It seems, however, that this provision did not prove entirely satisfactory to some of the Indians, who regretted their emancipation and the loss of the protection of the Government, and in the treaty of 1868 there was incorporated in the preamble a recital that "a portion of the Wyandottes, parties to the treaty of 1855, although taking lands in severalty, have sold said lands, and are still poor, and have not been compelled to become citizens, but have remained without clearly recognized organization, while others who did become citizens are unfitted for the responsibilities of citizenship; and . . . have just claims against the government, which will enable the portion of their people herein referred to begin anew a tribal existence;" therefore it was agreed by article thirteen that the United States would set apart for the Wyandottes certain land ceded by the Senecas, in order to provide for these Indians, and would make a register of all who declare their desire to be and remain Indians in a tribal condition, who should thereafter constitute the tribe.

It is sufficient to say of this that it could not apply to Carey Rodgers personally, since he died before the treaty was ratified; and there is no evidence that his heirs ever elected to resume their tribal relations and to become again members of the incompetent class. As Article XV removed all restrictions upon the sale of lands by incompetents, if the heirs of Carey Rodgers took the position that the article did not apply to them, they assumed the burden of proving that fact.

2. Plaintiffs' assertion, that defendants were not in possession

under color of title, is untenable.   They had taken possession under a deed executed by Rodgers, November 14, 1864, which was valid upon its face, made by one having title to the land, and in which the grantor covenanted that he was seized in fee simple, had good right to sell the same, that it was free from encumbrance, and that he would warrant and defend the title unto the grantees against the claims of all persons.   The court finds that the defendants and their grantors acted in good faith in making the purchase of said lands and in taking this deed, by which we understand that they paid a valuable consideration, and had no actual notice of any defect in the title of their grantor.   It is true that if the grantees had examined the Rodgers patent they would have discovered the restraint upon his alienation of the land; but it was too much to say that a deed valid upon its face, and taken in good faith for a valuable consideration, without actual notice of the facts, does not give color of title.   Color of title was defined by this court in *Wright* v. *Mattison,* 18 How. 50, 56, " to be that which in appearance is title, but which in reality is no title."   Said Mr. Justice Daniel : " The courts have equally concurred in attaching no exclusive or peculiar character or importance to the ground of the invalidity of an apparent or colorable title; the inquiry with them has been, whether there was an apparent or colorable title, under which an entry or a claim has been made in good faith."   See also *Beaver* v. *Taylor,* 1 Wall. 637 ; *Cameron* v. *United States,* 148 U. S. 301, 307.   There was no evidence in this case, except from the patent, that the grantees even knew that Rodgers was an Indian, as was the case in *Taylor* v. *Brown,* 5 Dakota, 344, much less that he belonged to the incompetent class, and they apparently received the deed, as many people do, without a careful examination of the grantor's title.   In Kansas possession without paper title seems to be sufficient. *Gilmore* v. *Norton,* 10 Kansas, 491 ; *Anderson* v. *Burnham,* 52 Kansas, 454.

The cases cited by the plaintiffs in support of their proposition that the deed from Rodgers did not constitute color of title, are those wherein there was an element of fraud, or want of good faith, which are expressly negatived by the finding of

the court in this case. *Livingston* v. *Peru Iron Co.,* 9 Wend.
511.

3. That no title could be acquired against the right of the
Secretary to declare the deed void, and hence the statute would
not begin to run until after such action by the Secretary of the
Interior. The case of *Gibson* v. *Chouteau,* 13 Wall. 92, 99, is
relied upon to sustain this proposition. In that case it was
held that the occupation of lands derived from the United States
under a new Madrid certificate, before the issue of a patent, for
the period prescribed by the state statute of limitations, was not
a bar to an action in ejectment for the possession of such lands,
founded upon the legal title subsequently conveyed by the pat-
ent; nor did such occupation constitute a sufficient equity in
favor of the occupant to control the legal title thus subsequently
conveyed. Obviously this case has no application to the one
under consideration. Here the United States had issued a pat-
ent to Rodgers " and to his heirs and assigns forever," subject
to a condition, not that the title should ever revert to the Uni-
ted States, but that he should not alienate the lands without the
consent of the Secretary of the Interior. The Government thus
passed all its title to the land in fee simple, and a violation of
the condition of the patent would not redound to the benefit of
the United States, or enable it to repossess the lands, but was
simply intended to protect the grantee himself against his own
improvident acts, and to declare that the title should remain in
him, notwithstanding any alienation that he might make.

We have considered all the points taken by the plaintiffs, and
are of the opinion that they are not sustained; that the judg-
ment of the Supreme Court of Kansas was right, and it is
therefore

*Affirmed.*

Mr. Justice White and Mr. Justice McKenna dissented.