UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles J. SCHWARZ et al., Defendants-
Appellants,

and

Fremont C. Woller et al., Defendants.

No. 71–1392.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 3, 1972.

Decided May 3, 1972.

Rehearing Denied June 19, 1972.

Richard P. Tinkham, Tinkham, Smith, Bliss & Patterson, Wausau, Wis., for defendants Charles J. Schwarz, Grace M. Schwarz, William F. Yeschek and Mary Lou Yeschek.

John O. Olson, U. S. Atty., Madison, Wis., Shiro Kashiwa, Dirk D. Snel, Dept. of Justice, Land & Natural Resources Div., Washington, D. C., Robert S. Lynch, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and KILEY, Circuit Judge.

HASTINGS, Senior Circuit Judge.

The United States of America filed this action seeking a decree to quiet title

to certain real estate in Wisconsin on behalf of the heirs of a Chippewa Indian patentee of the land as the result of adverse claims and actions of an adjacent landowner. Following a trial to the court,[1] without the intervention of a jury, the trial court made detailed findings of fact, stated its conclusions of law in an unpublished memorandum opinion and entered a judgment and decree thereon favorable to the plaintiff. Defendants Schwarz and Yeschek alone have appealed from the entire judgment, except that part thereof which dismissed the cross-complaint of defendants Woller and Reinhardt against them. We affirm.

For purposes of clarity and identification we deem it advisable to set out in full the findings of fact made by the district court:

"Facts.

The subdivision lines in Township 40 North, Range 4 East, 4th Principal Meridian, Vilas County, in this Western District of Wisconsin, were surveyed from July 22, 1865, through July 31, 1865. The plat of survey for this township was approved October 15, 1865 and is the official plat of this township. There have been no subsequent official surveys or resurveys. Government Lots 4 and 5 were shown in said plat of survey as they appear in the following diagram:

## Diagram A

N

[A5715]

The acreage of Lot 4 is shown on the plat of survey as 57.7, and that of Lot 5 as 54.4. The line dividing Lots 4 and 5, as shown on the plat, coincides with the

---

1. The United States District Court for the Western District of Wisconsin, Honorable James E. Doyle, Judge, presiding.

quarter-section line of Section 23. The irregularly shaped line along what appear to be the eastern edges of Lots 4 and 5 represents a rough approximation of the meander lines described in the surveyor's notes; the meander lines, in turn, were intended to assist in determining the approximate size of the said lots by indicating the approximate location of the shore line of a lake which has since come to be known as Tippecanoe Lake.

The actual boundary of Tippecanoe Lake as it existed in 1961, and at the time of trial, and the meander line as described in 1865, are as they appear in diagram B, on the following page.

On diagram B, a peninsula which extends into Tippecanoe Lake has been shaded, thus:

The dispute in this suit concerns that portion of the peninsula which has also been cross-shaded, thus:

[A5716]

The cross-shaded area represents that portion of the peninsula which lies south of the dividing line between Lots 4 and 5 if said dividing line were to be extended in an easterly direction. The entire peninsula contains about 16.3 acres; the disputed portion of the peninsula contains about 3.8 acres.

**Diagram B**

[A5717]   Lots 4 and 5 are riparian to Tippecanoe Lake.

The depth and configuration of Tippecanoe Lake as of the time of trial are approximately as they were in 1865. The peninsula is what is known to geologists as an outwash ridge. The bay between the west shoreline of the lake and the west and south shores of the peninsula consists of two waterfilled depressions, or kettles. The most narrow and most shallow stricture in the bay is an inter-kettle ridge. At this point, the bay is about 40 feet wide. At this point, also, in the autumn, when water levels typically are not high, depth of the water in the bay is about two and one-half feet to three feet. Unless there may have been brief unusually dry periods over the years, the depth of the water in the bay has not been less than two and one-half feet to three feet, and it has probably been greater in the past. From 1865 until the present, the depth of the water in the lake, including the water in the bay, has been sufficient to float logs and boats.

Lot 4 was allotted to Be bo ke we (also known as John Whitescott), a Chippewa Indian, pursuant to Article 3 of a treaty concluded September 30, 1854, with the Chippewa Indians of Lake Superior and the Mississippi, 10 Stat. 1109, and a patent was issued to Be bo ke we December 28, 1895. Said patent provided that the allottee and his heirs could not sell, lease, or otherwise alienate the tract without the consent of the President of the United States.

Be bo ke we died intestate July 5, 1919, and his heirs were determined to be Annie Whitescott, one-third, Mary Whitescott, one-third, and Margaret Whitescott, one-third. Margaret Whitescott died intestate October 13, 1932, and her heirs were determined to be Annie Whitescott (or Annie Whitescott Abraham), one-half, and Mary Whitescott (or Mary Whitescott Theobold), one-half.

Lot 5 was originally patented to an Indian who, with the necessary consent of the Secretary of the Interior, conveyed the property. The lot passed through a chain of title until it was conveyed in 1947, by warranty deed, to William Yeschek and Elsie Yeschek, who were the parents of the William F. Yeschek, named as a defendant in this action; the deed described the property simply as Government Lot 5, and contained no express description of any portion of the peninsula. Yeschek, Sr., immediately built a road through Lot 5, west of Tippecanoe Lake, running in a northerly-southerly direction, and extended it into and across Lot 4 in an easterly direction and then down the peninsula, in a southerly direction, to that portion of the peninsula now in dispute. His intention was to use the road to service the now disputed portion of the peninsula, which he considered to be a part of Lot 5. The construction and use of this road by Yeschek, Sr., was well known to the Whitescotts, who owned Lot 4, and it was well known to representatives of the Great Lakes Indian Agency, of the United States Department of the Interior. However, the Agency advised Yeschek, Sr., in 1947, and again in 1952, of the Agency's opinion that the disputed portion of the peninsula was a part of Lot 4 and not a part of Lot 5.

The defendant in this action, William F. Yeschek, Jr. (hereinafter "defendant Yeschek") acquired Lot 5 from his parents, and in 1960 the defendants Yeschek conveyed the now disputed portion of the peninsula to the defendants Schwarz, for a consideration, by a warranty deed in which the property was described as a part of Lot 5. In 1965, the defendants Schwarz conveyed the disputed portion of the peninsula to the defendants Woller (an undivided one-half interest) and to the defendant Louise Reinhardt (an undivided one-half interest), for $12,000 by a warranty deed in which the property again was described as a part of Lot 5. The Schwarzes received $5000 in cash, and took a note for $7000, secured by a purchase money mortgage from the defendants Woller and the defendants Reinhardt, in which the property again was described as a part of Lot 5.

Defendants Woller and Reinhardt proceeded to plat and to improve to a small extent the now disputed portion of the peninsula, preparatory to selling it off in lots. Defendants Woller and Reinhardt defaulted on their mortgage payments, and the defendants Schwarz commenced a foreclosure action in a Wisconsin state court on May 20, 1966, against defendants Woller and Reinhardt. The defendants Woller and Reinhardt were duly served, but failed to appear in the foreclosure proceedings; and findings of fact, conclusions of law, and a judgment of foreclosure were entered in August, 1966. The state court found that the defendants Woller and the defendant Reinhardt had given a valid mortgage to the defendants Schwarz, and that the mortgagors had defaulted on the mortgage note. On December 29, 1967, this present action was commenced in this court by the United States. On December 20, 1967, the defendants Schwarz bid in the property at the sheriff's sale in the state court foreclosure proceeding, and in January, 1968, they obtained a sheriff's deed.[1] No appeal has been tak-

1. In 1969, while this action was pending in this court, the defendants Schwarz delivered a quit claim deed to the disputed property to the defendants Yeschek.

en from the judgment in the state court proceeding, and the time for appeal has expired. No proceeding of any kind has been commenced in the state courts to set aside the foreclosure judgment.

In addition to their one-half of the $5000 down payment to the defendants Schwarz, the defendants Woller incurred about $751.25 in surveying expenses, attorneys' fees, and travel costs in connection with the transaction, and the defendant, Louise Reinhardt incurred about $1071 in expenses for surveying, repairs to road, snowplowing and bulldozing, and similar items.

Defendant Vilas County has assessed real estate taxes since 1965 on the disputed portion of the peninsula.

One issue of fact, which may be pertinent, remains to be mentioned. Defendants Yeschek and Schwarz contend, and emphasize the contention, that in the 1865 government survey an island in Tippecanoe Lake located easterly from the northerly portion of Lot 4 was meandered and surveyed so as actually to have been included as a part of the mainland and as a part of Lot 4, whereas the entire peninsula in question was not. See diagram B, above. A finding of fact on this point is to be made only with great difficulty. The meander lines include a relatively small portion of the island in question, as it exists in fact. As against defendants' interpretation, it may be contended with equal force that the somewhat rectangular projection of the meander line in an easterly direction represents a crude attempt to outline the peninsula lying beneath it and pointing in a southerly direction. I am unable to make a finding either way. I expressly decline to find that the meander line was intended to include the island referred to by defendants. I do find that the peninsula was not intentionally omitted from the 1865 survey."

From our examination of the record in this case, the briefs filed by all parties and the oral argument had on this appeal, we find and conclude that the facts as found by the district court are amply supported by the evidence and may not be set aside as clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

Some things appear clear and may be summarized. Government Lots 4 and 5, as conveyed in the original patents, are shown to be a part of the Lac du Flambeau Indian Reservation on an 1865 official government plat, based on a government survey run that same year. Diagram A, shown in the district court's findings, *supra*, follows the contours of the government plat. It is conceded that the meandered lake shown thereon is Lake Tippecanoe. The acreage of Lot 4 is shown on the plat of survey as 57.7, and that of Lot 5 as 54.4. On Diagram B is shown a peninsula extending south from Lot 4 which contains 16.3 acres. *The cross-shaded part of the peninsula*

*represents the disputed portion thereof, containing 3.8 acres.* The peninsula was not shown in the 1865 survey and was not described in the patents to Lots 4 or 5.

Lot 4 was originally alloted to a Chippewa Indian, Be bo ke we (also known as John Whitescott), pursuant to an 1854 Indian treaty, and a restricted-fee patent was issued to him on December 28, 1895. The patent prohibits the alienation of the patented lot without the consent of the President of the United States, and such consent was neither sought nor given. Lot 4 is now owned in equal shares by the patentee's present surviving heirs, Annie Whitescott and Mary Whitescott Theobold. The instant suit was brought by the United States on behalf of said Indian heirs.

Lot 5 adjoins Lot 4 to the south and was also covered by a restricted-fee Indian patent. The restrictions were subsequently removed and the original Indian patentee, with the necessary consent of the Secretary of the Interior, conveyed the property. Lot 5 passed through a chain of title until it is now owned by defendants, William F. Yeschek and Mary Lou Yeschek, his wife. The chain of title beginning with the United States patent simply describes the property as Lot numbered 5, containing 54.40 acres.

As indicated in the trial court's finding, the current dispute began in 1947 when the senior Yeschek constructed a road through Lot 5, extending it across Lot 4 and then down through the peninsula in a southerly direction to the 3.8 acre portion of the peninsula now in dispute. This action was immediately challenged by letters to the senior Yeschek from the Superintendent of the Great Lakes Indian Agency, in 1947, and the Area Director of the Bureau of Indian Affairs, in 1952. These letters declared that no part of the peninsula was in Lot 5, but instead was a part of Lot 4, and was Indian owned.

The two ultimate issues to be determined on this appeal are (1) whether the district court erred in denying appellants' claim to the 3.8 acre tract at the southern end of the peninsula separated from Lot 5 by a bay in Lake Tippecanoe, a navigable lake; and (2) whether, either under the Color of Title Act, Title 43, U.S.C.A. § 1068, or under Wisconsin adverse possession statutes, the appellants acquired title to the 3.8 acre tract by adverse possession.

I.

As the district court noted in its memorandum opinion, all parties appear to concede "that the meander lines included in the 1865 survey were not intended to form the eastern boundaries of Lots 4 and 5." Appellants further agree with the court that the "initial question is to determine what the eastern boundary of Lot 5 was intended to be."

The Government contended that the eastern boundaries of the two lots coincided with the western shore of Lake Tippecanoe and appellants claimed they coincided with the eastern shore of the peninsula.

Appellants assert the trial court erred in concluding that the resolution of this controversy is a question of federal law and contend that Wisconsin law controls. Our examination of the authorities cited by both parties leads us to conclude that this case is controlled by federal law.

Appellants rely heavily on Weaver v. Knudson, 23 Wis.2d 426, 127 N.W.2d 217 (1964), in support of their argument that the law of Wisconsin is controlling. However, our reading of this case leads us to agree with the district court that the factual situation in *Weaver* seems readily distinguishable. Further, we are not at all impressed with the suggestion that *Weaver* stands for the principle of applying state rather than federal law to a situation such as presented here.

In our judgment the principles announced by the Supreme Court in Hughes v. Washington, 389 U.S. 290, 291–293, 88 S.Ct. 438, 440, 19 L.Ed.2d 530 (1967), and the cases cited therein, make clear "that a dispute over title to lands owned by the Federal Government is governed by federal law, although of course the Federal Government may, if it desires, choose to select a state rule as the federal rule." *Id.* There is no showing that the Federal Government has elected to make such a choice in the case at bar. *See* Borax, Consolidated Ltd. v. Los Angeles, 296 U.S. 10, 22, 56 S.Ct. 23, 80 L.Ed. 9 (1935); United States v. Oregon, 295 U.S. 1, 28, 55 S.Ct. 610, 79 L.Ed. 1267 (1935); Gibson v. Chouteau, 13 Wall. 92, 20 L.Ed. 534 (1872). Our circuit in United States v. Severson, 7 Cir., 447 F.2d 631, 634 (1971), has adopted the federal rule, citing *United States* v. *Oregon, supra.*

The evidence supports the district court's finding and conclusion that the peninsula was morphologically a part of Lot 4. Likewise, under applicable federal standards,[2] the record shows that Lake Tippecanoe is a navigable waterway of the United States. There was a further finding that "the peninsula was not intentionally omitted from the 1865 survey," and, no such evidence having been offered, it follows that the survey was not fraudulent.[3] There was no evidence tending to show that dry land ever connected Lot 5 with the peninsula at any point in 1865, or thereafter.

■ Under all the facts and circumstances presented here, we have concluded that, as a matter of law, all of the peninsula, shown on the plat as extending into a meandered lake, passed to the pat-entee of Lot 4 and not to the patentee of Lot 5 or appellants.[4] It necessarily follows that the district court did not err in concluding that the eastern boundary of Lot 5 is defined by the western edge of the waters by the bay, which bay lies between the peninsula and the western shore of the lake.

We have considered alternative suggestions by appellants that they should prevail whether Wisconsin decisions or federal statutes and decisions control and find them unpersuasive.

### II.

Appellants' alternative claim of title by adverse possession is grounded either on the Wisconsin 10 and 20-year statutes, Wis.Stat.Ann., §§ 893.06 and 893.08, respectively, or on the federal 20-year Color of Title Act, 43 U.S.C.A. § 1068.

■ We find no merit in the contention concerning the state adverse possession statutes. As to Lot 4, the restrictions against alienation have not been removed. It has long been held that adverse possession under a state statute of limitations cannot run against Indians if the land is not alienable by them, so long as such restrictions exist. United States v. 7,405.3 Acres of Land, 4 Cir., 97 F.2d 417, 422–423 (1938). It has been noted that a similar holding was made by the court in the Western District of Wisconsin in a prior case concerning a restricted-fee patent granted to a Chippewa Indian pursuant to the same Chippewa treaty here involved. United States v. Raiche, D.C.W.D.Wis., 31 F.2d 624 (1928). There the court said at 628: "Furthermore, the [Wis-

2. Utah v. United States, 403 U.S. 9, 10–11, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); State of Wisconsin v. Federal Power Commission, 7 Cir., 214 F.2d 334, 336–338 (1954), cert. denied, 348 U.S. 883, 75 S.Ct. 124, 99 L.Ed. 694.

3. *See* United States v. Lane, 260 U.S. 662, 666–667, 43 S.Ct. 236, 67 L.Ed. 448 (1923).

4. *See Lane*, at 664, 666, 43 S.Ct. 236, 67 L.Ed. 448; Thomas B. Bishop Co. v. Santa Barbara County, 9 Cir., 96 F.2d 198, 201–202 (1938), cert. denied, 305 U.S. 623, 59 S.Ct. 84, 83 L.Ed. 398.

consin] statute of limitations cannot run against these plaintiffs, who, with respect to this land, are still under disability." *Cf.* Schrimpscher v. Stockton, 183 U.S. 290, 295–296, 22 S.Ct. 107, 110, 46 L.Ed. 203 (1902).

In a case involving the right of the United States, on behalf of an Indian patentee, to collect interest on taxes illegally levied upon his land, Board of Com'rs v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939), Mr. Justice Frankfurter said, at 351, 60 S. Ct. at 288: " * * * [S]tate notions of laches and state statutes of limitations have no applicability to suits by the Government, whether on behalf of Indians or otherwise. * * * This is so because the immunity of the sovereign from these defenses is historic. Unless expressly waived, it is implied in all federal enactments."

■ The Color of Title Act, *supra,* only governs "public lands." We have held, as the district court concluded, that the disputed 3.8 acres passed to the Indian patentee of Lot 4. The acreage and the lot were thereby removed from the "public land," as that term is used in 43 U.S.C.A. § 1068. It could not be alienated without the express consent of the President of the United States. It was not subject to a claim of adverse possession under the provisions of the Act sought to be involved.

■ As the Government aptly points out, if the disputed acreage did not pass to the patentee it remains instead a part of the Lac du Flambeau Indian Reservation as shown on the 1865 plat. It has long been established that Indian reservation land is not public land. Leavenworth, etc., R.R. Co. v. United States, 92 U.S. 733, 746–747, 23 L.Ed. 634 (1875); Minnesota v. Hitchcock, 185 U.S. 373, 395–402, 22 S.Ct. 650, 46 L.Ed. 954 (1902); and United States v. McIntire,

9 Cir., 101 F.2d 650, 654 (1939), citing *Leavenworth* and *Hitchcock, supra.*

The adverse findings and holdings against other defendants are not challenged in this appeal. We have carefully reviewed all other questions raised by defendants and do not find it necessary to discuss them further.

For the *foregoing* reasons, the judgment of the district court in all things is affirmed.

Affirmed.