**UNITED STATES of America on Behalf of HEIRS TO THE ABSENTEE WYANDOTTE ALLOTMENT of Laura M. VAN PELT, Plaintiff,**

v.

**WEYERHAEUSER COMPANY, Defendant.**

**Civ. No. 90–6516–JO.**

United States District Court, D. Oregon.

May 14, 1991.

---

Charles H. Turner, U.S. Atty., Portland, Or., Richard B. Stewart, Land & Natural Resources Div., Environmental Defense Section, David W. Harder, Environment & Natural Resources Div., Indian Resources Section, Washington, D.C., for plaintiff.

Norman J. Wiener, Peter C. Richter, Miller Nash Wiener Hager & Carlsen, Portland, Or., for defendant.

## OPINION

ROBERT E. JONES, District Judge:

The United States brings this action to regain title to an eighty-acre tract of land in Klamath County, Oregon for the heirs of an Indian allottee. The United States, on behalf of the heirs of the allottee, requests an ejectment of defendant, a return of the land, and damages for nearly fifty years of alleged wrongful occupancy by defendant. The court has jurisdiction under 28 U.S.C. § 1345.

In 1904, Congress passed a statute authorizing Absentee Wyandotte Indians to select 80 acres of agricultural lands from the surveyed public nonmineral domain. Under the statute, a patent was to be issued to the Absentee Wyandotte Indians by the United States subject to the "condition that the lands covered thereby shall not be aliened without the consent of the Secretary of the Interior."

On March 28, 1907, the United States issued a restricted fee title in property known as the Absentee Wyandotte Allot-

ment of Laura M. Van Pelt (Van Pelt). In issuing the restricted fee title to Van Pelt, the United States included the recital "[t]hat the said land shall not be aliened without the consent of the Secretary of the Interior."

While the Van Pelt allotment remained subject to the restriction on alienation, and without obtaining the consent of the Secretary of the Interior, Laura M. Prof, formerly Van Pelt, executed a deed and purported to sell the allotment to J.W. Farnell on May 26, 1917.

On May 19, 1923, the warranty deed to Farnell was filed in the Klamath County records. On May 21, 1923, the United States filed the patent to Van Pelt in the Klamath County records.

Between 1917 and 1942, the Van Pelt Allotment was conveyed several times without the consent or knowledge of the Secretary of the Interior. On December 24, 1942, Weyerhaeuser Company (defendant) purported to acquire title to the Van Pelt Allotment.

The United States contends that because the attempted sale by Van Pelt on May 26, 1917 was not approved by the Secretary of the Interior, the deed was null and void and did not convey title to the property. Because defendant's title originated with the invalid 1917 conveyance, the United States claims defendant's title is subject to the claim of the United States who holds title to the property for the heirs of Van Pelt.

The United States submits that it attempted to settle the matter with defendant in 1986–1988. Defendant has refused to quiet title in the heirs of Van Pelt or to compensate the heirs for defendant's extensive trespass.

Defendant moves to dismiss the action under Fed.R.Civ.P. 17(a) or, in the alternative, moves for an order to substitute the heirs of Van Pelt as the proper plaintiffs under Fed.R.Civ.P. 19(a).

Defendant states the following in support of its motion: 1) the United States has no standing because the real property in question was not Indian lands held in trust by the United States, but rather lands in the public domain and 2) the United States has no standing because the acts complained of occurred after the United States' rights in the property were extinguished by the issuance of its patent.

QUESTIONS PRESENTED BY DEFENDANT

1. Is the United States the real party in interest? [Yes]

2. Does the United States have standing to sue when the allotment at issue was unpatented land from the public domain? [Yes, the United States has standing because the land is subject to a restricted fee patent]

3. Does the United States have standing to sue when the transaction at issue took place after the original patent was issued? [Yes, the patent is the source of a continuing, rather than the termination, of the United States' trust obligation]

4. Should the heirs of Van Pelt be substituted for the United States as the proper plaintiff? [No]

FED.R.CIV.P. 17(a)

■ Fed.R.Civ.P. 17(a) provides:

Every action shall be prosecuted in the name of the real party in interest. . . . and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

The defendant submits that because the United States has neither alleged nor has defendant found any statute of the United States enabling the United States to bring this action on behalf of the heirs of Van Pelt, the complaint should be dismissed or the heirs of Van Pelt should be substituted.

The United States correctly points out that the lack of an authorizing statute does not render the United States an improper plaintiff. Although federal statutes may exist authorizing the United States to bring action on behalf of another, the United States "is of course the real party in interest as to claim regarding U.S. properties or interests." Schwarzer, Tashima, & Wagstaffe, *Federal Civil Procedure Before Trial*, § 7:18 (1991).

> The special provision for actions for the use and benefit of another refers only to statutory proceedings. It does not preclude the institution of nonstatutory actions in the name of the United States for the benefit of another in circumstances in which an obligation exists on the part of the government to bring suit on behalf of a private party.

6A Wright, Miller, & Kane, *Federal Practice and Procedure*, § 1551 (1990) (footnotes omitted).

Further,

> it is no longer open to question that the United States has capacity to sue for the purpose of setting aside conveyances of lands allotted to Indians under its care, where restrictions upon alienation have been transgressed.... [T]he precise question has been determined by this court in *Heckman v. United States* [224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912) ] ... and it was there held that the authority to enforce restrictions of this character is the necessary complement of the power to impose them.

*Bowling v. United States*, 233 U.S. 528, 534–36, 34 S.Ct. 659, 660–61, 58 L.Ed. 1080 (1914).

The federal courts have consistently allowed the United States to bring suits based on the United States' trust responsibility to allottees issued fee patents with restrictions on alienation.

The United States is the real party in interest.

STANDING

■ Defendant argues that the United States only has standing to prosecute claims on behalf of Indians which relate to rights in real property if the property is either 1) property held in trust for the Indians where the United States is the trustee; or 2) property restricted allotment lands which were originally trust or reservation land, but conveyed to individual Indians. Defendant cites to the *Handbook of Federal Indian Law*, U.S. Dept. of Interior, Office of the Solicitor, Ch. 11 (1945) for authority.

According to defendant, the Van Pelt land was neither Indian trust land nor allotment land where the United States was a former trustee. Rather, defendant characterizes the Van Pelt land as "surveyed public nonmineral domain" land.

Defendant, however, incorrectly perceives the nature of the land in question. The Secretary of the Interior has a trust relationship with restricted allotments. *See Heckman v. United States*, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912). The crucial element in determining the trust relationship of the allotment is the restriction on alienation, not the type of federal land allotted to the individual Indian. *See United States v. Ramsey*, 271 U.S. 467, 471, 46 S.Ct. 559, 560, 70 L.Ed. 1039 (1926) ("In practical effect, the control of Congress, until the expiration of the trust or the restricted period, is the same.").

The United States has standing to pursue this action.

PATENT ISSUANCE

■ Defendants assert that even if the United States has standing to bring this action, the issuance of the patent extinguished any existing rights.

Defendants rely upon *United States v. Moore Mill & Lumber Co.*, 313 F.2d 71 (9th Cir.1963) for support. In a previous action, a court had found that defendants fraudulently induced an Indian allottee to sell her land for a grossly inadequate price while the title to the land was still held in trust by the United States. Judgment was for the plaintiff, the United States.

In *Moore Mill*, the United States brought an action to recover damages from the lumber company to whom timber was sold by the liable defendants in the previous action. Judge Solomon granted the defen-

dant's motion to dismiss because "a fee simple patent on [the] land ... was issued to ... [the Indian allottee] before the alleged conversion took place." *Moore Mill,* at 72. Judge Solomon submitted that "[t]he cases relied upon by the government in support of the contention that its obligation extends beyond the trust period all involve acts committed during the restricted period." *Moore Mill,* at 73.

The Ninth Circuit stated that although

> [t]hese facts may well state a claim for conversion ... [the facts] cannot justify extension of the trust authority of the United States to include a power to sue on behalf of one no longer its ward with respect to acts of a defendant all of which occurred after the trust had terminated.

*Moore Mill,* at 73.

In the present case, unlike in *Moore Mill,* the patent issued to Van Pelt was restricted. Van Pelt never received an unrestricted patent. The United States correctly submits that "[t]he issuance of the restricted fee patent is the basis for the continuation, rather than the elimination, of the United States' trust obligation."

The issuance of the restricted fee patent did not extinguish the United States' right to bring this action.

FED.R.CIV.P. 19(a)

■ Fed.R.Civ.P. 19(a) provides that

> [a] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Defendant argues that it will be prejudiced [1] and that it will face double exposure if the United States is allowed to be the plaintiff.

Defendant's arguments lack merit.

> It was not necessary to make these grantors parties, for the government was in court on their behalf. Their presence as parties could not add to, or detract from, the effect of the proceedings to determine the violation of the restrictions and the consequent invalidity of the conveyances.

*Heckman, supra,* 224 U.S. at 445, 32 S.Ct. at 434. Further, regarding double exposure,

> if the United States, representing the owners of restricted lands, is entitled to bring a suit of this character, it must follow that the decree will bind not only the United States, but the Indians whom it represents in the litigation.

*Heckman,* at 445–46, 32 S.Ct. at 434–35.

The heirs of Van Pelt should not be substituted for the United States as the proper party plaintiff.

DEFENDANT'S REPLY

1. Emancipation

■ Defendant contends that the United States cannot bring this suit because the Absentee Wyandotte Indians were emancipated.

Defendant submits *Schrimpscher v. Stockton,* 183 U.S. 290, 22 S.Ct. 107, 46 L.Ed. 203 (1902) in support of its argument. In *Schrimpscher,* the heirs of a Wyandotte Indian brought an action to recover a tract of land. The United States was not a party to the action.

The facts of *Schrimpscher* are as follows: In 1855, the United States entered into a treaty with a number of Indians, including the Wyandottes. Article four of the treaty provided for the issuance of unconditional patents to "competent" Indians and the issuance of restricted patents to "incompetent" Indians. Carey Rodgers received a restricted patent, which stated

---

**1.** Defendant argues that if the United States is allowed to remain as the plaintiff, defendant will be prejudiced because defendant may not be able to assert certain defenses against the United States which it could assert against the Van Pelt heirs.

"[t]hat the said tract shall never be sold or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior ... and with the further and express condition ... that the lands are not to be sold or alienated for a period of five years."

Carey Rodgers executed a deed in fee simple to Jesse Cooper and Mary E. Stockton. The Supreme Court stated

[t]he deed of Carey Rodgers's own allotment of November 15, 1864, was clearly void, since as to this contract, at least, he was incompetent, and took under a patent which provided that the land should never be sold or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior. If the case stood upon defendants' rights under this deed alone, there could be no doubt whatever that Rodgers's heirs were entitled to the land.

*Schrimpscher*, 22 S.Ct. at 109.

But the case did not stand alone on the deed. On February 23, 1867, another treaty was entered into between the United States and several Indian tribes. Article 15 of the treaty provided that

[a]ll restrictions upon the sale of lands assigned and patented to "incompetent Wyandottes under the fourth article of the treaty [of 1855] ... shall be removed after the ratification of this treaty, but no sale of lands ... [by an incompetent Wyandotte] shall be made ... until voluntarily sold by the patentee or his or her heirs, with the approval of the Secretary of the Interior; and whereas many sales of land belonging to this class have ... been made contrary to ... the treaty [of 1855] ... it is agreed that a thorough examination and report shall be made under direction of the Secretary of the Interior, in order to ascertain the facts relating to all such cases; and upon a full examination of such report and hear-

ing of the parties interest, the said Secretary may confirm the said sales, or require an additional amount to be paid, or declare such sales entirely void...."

*Schrimpscher*, 22 S.Ct. at 109.

In *Schrimpscher*, no action was taken to validate the sale. The court held that plaintiffs, the heirs, "were bound to assert their claims within the period limited by law." Because the plaintiffs did not assert their rights until more than twenty years after 1868, the date of the proclamation of the treaty, the plaintiffs lost their rights by adverse possession. *Schrimpscher*, 22 S.Ct. at 110.

Another case relied upon by defendant is *United States v. Waller*, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843 (1917). In *Waller*, the Supreme Court held that because a subsequent act by Congress (the Clapp Amendment) evidenced Congressional intent to grant full power and control to the Indians, notwithstanding the prior issuance of restricted patents, the United States lacked capacity to bring the action. *Waller*, 37 S.Ct. at 433.

Defendant contends that, like in *Schrimpscher* and *Waller*, by the examining of the legislative history and past Congressional pronouncements,[2] Congress emancipated the Absentee Wyandotte Indians, depriving the United States of standing to bring this suit.[3] Defendant contends that while there is no specific language in the 1904 Act evidencing Congress' intent to emancipate the Absentee Wyandottes, the spirit of the 1904 Act and its predecessors was that the United States was finished protecting the Absentee Wyandotte Indians.

Congress' intent in the 1904 Act is crystal clear, regardless of what may have been said in the past.[4] The Act itself states "the Secretary of the Interior ... shall cause a patent to issue in the name of the enrolled Absentee Wyandotte ...

---

2. In 1894 and 1895, Congress passed legislation applicable to the Absentee Wyandotte Indians.

3. Although argued in its reply, at oral argument, defendant agreed that the 1956 Act did not address or implicate the Absentee Wyandotte Indians.

4. According to defendant, the 1895 Act provided for cash payments to the Absentee Wyandottes, provided that the cash was accepted as full payment of all claims against the government.

which patent shall contain the condition that the lands covered thereby shall not be aliened without the consent of the Secretary of the Interior." Further, the legislative history states "[i]t is the duty of Congress, upon which devolves the care of its wards, the Indians, by and through the honorable Secretary of the Interior, to afford him an opportunity to give relief to these unfortunate Wyandottes." H.R.Rep. No. 2681, 57th Cong., 1st Sess., at 2 (1902). The Absentee Wyandotte Indians were not emancipated. The United States does not lack standing to bring this action.

### 2. Allotted Lands

■ Defendant claims that the United States cannot bring this suit because the land at issue is not "allotted" land.[5]

Defendant argues that the term "allotted" does not appear in the 1904 statute and that

> [n]either the statute under which the patent was issued nor the patent itself makes any conveyance automatically void; it leaves no right of reversion in the government; and it provides no basis for the government having any interest in the property once it delivered the patent to her in 1910.

Defendant submits what Congress could have done, according to defendant, to protect the United States' ability to bring this action.

What defendant ignores is the plain language of what was done. The patent provides "the said lands shall not be aliened without the consent of the Secretary of the Interior." The deed restriction gives the United States a basis upon which to bring a suit like the present one.

Defendant attempts to avoid the language of the deed by citing to the following dictum from *Schrimpscher:*

> the United States had issued a patent to Rodgers "and to his heirs and assigns forever," subject to a condition, not that the title should ever revert to the United States, but that he should alienate the

lands without the consent of the Secretary of the Interior. The government thus passed all its title to the land in fee simple, and a violation of the condition of the patent would not redound to the benefit of the United States, or enable it to repossess the lands, but was simply intended to protect the grantee himself against his own improvident acts, and to declare that the title should remain in him, notwithstanding any alienation that he might make.

*Schrimpscher,* 22 S.Ct. at 111.

Defendant argues that because the Van Pelt patent says "unto ... Van Pelt, and to her heirs and assigns forever," the United States passed all title in fee simple. Thus, defendant argues the United States does not have standing. Although it is true that the United States passed a title in fee to Van Pelt, the title contained a restriction. The violation of which entitles the United States to bring this action.

Moreover, defendant's argument based upon the strict legal definition of the term "allotted" is without merit.

In *United States v. Jackson,* 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361 (1930), an Indian, Jack Williams, received a trust patent on July 4, 1884 under the 1884 Act. The purpose of the 1884 Act was to provide Indians with the same privileges as citizens of the United States enjoyed under federal homestead laws. The patent recited that the United States held the land in trust for the sole use and benefit of the Indian for a period of twenty-five years and that at the end of the period, the United States would convey a fee simple patent to the Indian or his heirs.

Before the twenty five year period ended, Jack Williams died. His interest passed to his widow, Nellie Williams.

Nellie Williams held the land until March 18, 1921, more than four years after the twenty five year period ended, when she deeded the land to Jack Jackson. In 1922,

---

**5.** "Allotted" land is land given to an individual Indian from the tribe's common holding. *See e.g., Montana v. Blackfeet Tribe of Indians,* 471

U.S. 759, 761, 105 S.Ct. 2399, 2401, 85 L.Ed.2d 753 (1985) ("The leases involved unallotted lands on the Tribe's reservations....").

Nellie Williams died leaving a will devising her property to Bob Roberts.

The United States brought suit on behalf of Bob Roberts to quiet title in him the land in question. The United States' argument was that although the twenty five year period had passed, the restriction on alienation had been extended by a series of one year executive orders from 1916 to 1919 and by a further twenty five executive order issued in 1920. The executive orders were authorized by the 1906 Act.

The following issues were before the Supreme Court:

1. Could the trust period and the restriction of alienation in an Indian homestead patent issued under the Act of 1884 be extended by executive order?

2. Did the Act of 1906 authorize the President in his discretion to continue restrictions on alienation in patents issued under the Indian Homestead Act of 1884?

The Court answered the first question in the affirmative.

This does not involve any question of an attempt to destroy vested rights. The power of the United States, delegated by the Act to the President, is to be exercised prior to the issuance of final patent. It has been held that until final patent be issued no vested right is obtained by the Indian which would support a constitutional objection to the enlargement of the period of the restriction....

What has here occurred is that the United States has conferred a privilege upon its wards ... and has surrounded its final acquisition with restrictions calculated to secure the advantage of the privilege to those intended to be benefited. Finding that the restrictions authorized at the time of the extension of the privilege will not, in all cases, be long continued enough to secure this result, Congress has authorized the Executive, in his discretion, to continue the restric-

tions for such period as he may deem best.

*Jackson*, 280 U.S. at 191, 50 S.Ct. at 145.

The Court went on to analyze the second question: because the 1906 Act refers only to Indian allottees, does that include Indian homesteaders under the 1884 Act? The Court concluded "that Indian allotments and Indian homesteads are in all essential respects upon the same footing." *Jackson*, 280 U.S. at 193, 50 S.Ct. at 146.

It cannot be supposed that Congress, in any part of this legislation, all of which is directed toward the benefit and protection of the Indians ... intended to exclude from the beneficent policy which each Act evidences, an Indian claiming under the homestead act, even though the statute uses the term "allottee."

*Jackson*, 280 U.S. at 196, 50 S.Ct. at 147.

In the present case, the fact that the 1904 Act, which authorized the Absentee Wyandotte Indians to select land, did not use the word "allotted" is not dispositive. As *Jackson* explicitly points out, the intent to benefit the Indians, rather than the presence or absence of the term "allotted," governs the construction of the statutes.[6]

Further, in *Carlo v. Gustafson*, 512 F.Supp. 833 (D.Alaska 1981), Alaska Natives brought suit to have an unrestricted deed issued to a third party, plaintiffs' sister, cancelled.

In the early 1950's, Frank Carlo Sr. bought and occupied a house and lot on federal property in Ruby, Alaska. Pursuant to the townsite laws, Ruby became a federal townsite in 1976. Natives of Ruby were thereby eligible to receive restricted or unrestricted deeds for lots which they presently occupied.

In August of 1976, defendant Barron applied to the federal trustee for an unrestricted deed to the house and lot. In her application she alleged that she inherited the property from her parents and said that no one else was claiming an interest in the land.

**6.** The court notes that the United States is not claiming that the Van Pelt allotment was home- stead land.

The officer for the Bureau of Indian Affairs failed to obtain two statements of two disinterested witnesses. In October of 1976, Barron was issued an unrestricted deed.

Plaintiffs claimed that they lacked knowledge of their sister's deed until 1977. Subsequently, Barron entered into a contract for the sale of the lot and house. Plaintiffs then brought this suit to have the unrestricted deed issued to Barron cancelled.

The court made several statements pertinent to the present action. "[S]tatutes passed for the benefit of dependent Indian tribes and communities are to be liberally construed in favor of the Indians." *Carlo*, 512 F.Supp. at 836 (citation omitted). Further, "[i]n dealing with homestead laws for the benefit of Indians, the Supreme Court has reasoned that the term 'allotment' should not be narrowly construed." *Id.* Most importantly,

> [a]s full title was conveyed under the 1926 Act, a trust responsibility in the traditional sense of the term did not exist—the Native acquired legal and equitable title. This does not mean, however, that the Federal Government cannot have binding obligations to the Alaska Native townsite owners ...
>
> ....
>
> It has been established that the trust doctrine is not limited to situations in which the government has retained legal title to the land.

*Carlo*, 512 F.Supp. at 838 (citation omitted).

*Carlo* demonstrates that the term "allotted" should be liberally construed and demonstrates that the United States has an obligation, notwithstanding the lack of a trust relationship in the strict sense of the word.

Perhaps the most persuasive authority submitted by the United States to show that it has standing to pursue this action is *Cramer v. United States*, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923). In *Cramer*, the United States brought the action on behalf of three Indians, who claimed to have occupied the land since at least 1859, to cancel a land patent issued in 1904 to Central Pacific Railway Company (Central Pacific). The grant to Central Pacific's predecessor excepted land "found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of." *Cramer*, 261 U.S. at 225, 43 S.Ct. at 343.

Central Pacific argued that because the extension of homestead privileges, the right of an individual Indian to acquire title to public lands by entry, did not occur until 1875, the land at issue did not fall within the exclusions of the grant.

The Court rejected this argument stating "[t]he fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive." *Cramer*, 261 U.S. at 229, 43 S.Ct. at 344.

> The action of these individual Indians in abandoning their nomadic habits and attaching themselves to a definite locality, reclaiming, cultivating and improving the soil and establishing fixed homes thereon was in harmony with the well understood desire of the Government.... To hold that by so doing they acquired no possessory rights to which the Government would accord protection, would be contrary to the whole spirit of the traditional American policy toward these dependent wards of the nation.

*Cramer*, 261 U.S. at 228–29, 43 S.Ct. at 344.

The Court stated that the property that was held by the three Indians "was within the policy and with the implied consent of the Government." *Cramer*, at 230, 43 S.Ct. at 345. The Court held that the property "falls within the clause of the grant excepting from its [Central Pacific's] operation lands 'reserved ... or otherwise disposed of.' " *Id.*

Another contention posed by Central Pacific was that the United States was without authority to maintain the suit in the capacity as guardian of the Indians. The Court found this contention meritless, but recognized that "Congress may, if it thinks fit, emancipate the Indians from their wardship wholly or partially, *United States*

*v. Waller." Cramer,* 261 U.S. at 233, 43 S.Ct. at 346.

This case superbly points out why defendant's argument is flawed. In *Cramer,* the Indians occupied public land, not pursuant to any statute or homestead right. In the present case, we have the benefit of an explicit statute. By virtue of it's being Indian land, this land is protectable by the United States because of the unique relationship between the Indians and the government. The United States has capacity to bring suit so long as the Indians have not been emancipated, which the Absentee Wyandotte Indians have not.

The United States has standing to bring this action.

CONCLUSION

Weyerhaeuser's motion to dismiss (# 6) is DENIED.