718 F.2d 1291
 CATAWBA INDIAN TRIBE OF SOUTH CAROLINA, also known as the
Catawba Nation of South Carolina, Appellant,
v.
STATE OF SOUTH CAROLINA, Richard W. Riley, as Governor of
the State of South Carolina; County of Lancaster, and its
County Council consisting of Francis L. Bell as Chairman,
Fred E. Plyler, Eldridge Emory, Robert L. Mobley, Barry L.
Mobley, L. Eugene Hudson, Lindsay Pettus; City of Rock
Hill, J. Emmett Jerome, as Mayor, and its City Council
consisting of Melford A. Wilson, Elizabeth D. Rhea, Maxine
Gill, Winston Searles, A. Douglas Echols, Frank W. Berry,
Sr.; Bowater North American Corporation; Catawba Timber
Co.; Celanese Corporation of America; Citizens and
Southern National Bank of South Carolina; Cresent Land &
Timber Corp.; Duke Power Company; Flint Realty and
Construction Company; Herald Publishing Company; Home
Federal Savings and Loan Association; Rock Hill Printing &
Finishing Company; Roddey Estates, Inc.; Southern Railway
Company; Springs Mills Inc.; J.P. Stevens & Company; Tega
Cay Associates; Wachovia Bank and Trust Company; Ashe
Brick Company; Church Heritage Village & Missionary
Fellowship; Nisbet Farms, Inc.; C.H. Albright; Ned
Albright; J.W. Anderson, Jr.; John Marshall Wilkins, II;
Jesse G. Anderson; John Wesley Anderson; David Goode
Anderson; W.B. Ardrey, Jr.; Eliza Beth Ardrey Grimball;
John W. Ardrey, Ardrey Farms; F.S. Barnes, Jr.; W. Watson
Barron; Wilson Barron; Archie B. Carroll, Jr.; Hugh
William Close; James Bradley; Francis Lay Springs;
Lillian Crandel Close; Francis Allison Close; Leroy
Springs Close; Patricia Close; William Elliot Close; Hugh
William Close, Jr.; Robert A. Fewell; W.J. Harris; Annie
F. Harris; T.W. Hutchinson; Hiram Hutchinson, Jr.; J.R.
McAlhaney; F.M. Mack, Jr.; Arnold F. Marshall; J.E.
Marshall, Jr.; C.E. Reid, Jr.; Will R. Simpson; John S.
Simpson; Robert F. Simpson; Thomas Brown Snodgrass, Jr.;
John M. Spratt; Marshal E. Walker; Hugh M. White, Jr.;
John M. Belk; Jane Nisbet Goode; R.N. Bencher; W.O.
Nisbet, III; Pauline B. Gunter; J. Max Minson; W.A.
McCorkle; Mary McCorkle; William O. Nisbet; Eugenia
Nisbet White; Mary Nisbet Purvis; E.N. Martin; Robert M.
Yoder, Appellees.
 No. 82-1671.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 8, 1983.
Decided Oct. 11, 1983.
 
 Don B. Miller, Native American Rights Fund, Boulder, Colo., Jean H. Toal, Columbia, S.C. (Belser, Baker, Barwick, Ravenel, Toal & Bender, Columbia, S.C., Robert M. Jones, Rock Hill, S.C., Mike Jolly and Richard Steele, Union, S.C., on brief), for appellant.
 James D. St. Clair, Boston, Mass. (James L. Quarles, III, William F. Lee, David H. Erichsen, Hale & Dorr, Boston, Mass., on brief) and John C. Christie, Jr., Chicago, Ill. (J. William Hayton, Stephen J. Landes, Lucinda O. McConathy, Bell, Boyd & Lloyd, Chicago, Ill., J.D. Todd, Jr., Michael J. Giese, Gwendolyn Embler, Leatherwood, Walker, Todd & Mann, Greenville, S.C., Dan M. Byrd, Jr., Mitchell K. Byrd, Byrd & Byrd, Rock Hill, S.C., T. Travis Medlock, Atty. Gen., Kenneth P. Woodington, Asst. Atty. Gen., State of S.C., Columbia, S.C., on brief), for appellees.
 Before HALL and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 The Catawba Indian Tribe of South Carolina appeals from the district court's grant of summary judgment in favor of South Carolina and 76 other defendants.[1] The court held that the Catawba Indian Tribe Division of Assets Act, 25 U.S.C. Secs. 931-38, and the South Carolina statute of limitations, S.C.Code Ann. Sec. 15-3-340 (Law.Co-op.1976), barred the Tribe's claim to land allegedly granted to the state in 1840 in violation of the Indian Nonintercourse Act, 25 U.S.C. Sec. 177. We reverse and remand for further proceedings on the merits of the Tribe's claim. We hold only that the grant of summary judgment cannot be sustained. For the purpose of ruling whether summary judgment was appropriate, we have assumed without deciding, as did the district court, that disputed facts on which the Tribe relies are true.
 
 
 2
 * Long before English and European settlers came to North America, the Catawba Tribe occupied its aboriginal territory in what is now parts of North and South Carolina. In the 1760 Treaty of Pine Tree Hill between the Tribe and the King of England's Superintendent for Indian Affairs, the Tribe relinquished its aboriginal territory in exchange for being quietly and permanently settled on a 144,000 acre tract.
 
 
 3
 The Tribe protested that England had failed to carry out the terms of the 1760 treaty and reasserted a right to its aboriginal territory. In 1763, the Tribe entered into the Treaty of Augusta with the King's representatives. In exchange for relinquishing its aboriginal territory, the Tribe again agreed to be settled on a 144,000 acre tract in South Carolina.[2] England fulfilled the terms of this treaty.
 
 
 4
 After the Revolutionary War, South Carolina initially recognized the Treaty of Augusta. There was increasing pressure from settlers, however, who wished to move onto the Tribe's land. By the 1830s, nearly all of the Tribe's land had been leased to non-Indians pursuant to state statutes. South Carolina then began to negotiate with the Tribe to purchase its land. These efforts culminated in 1840 in the Treaty of Nation Ford in which the Tribe gave up the 144,000 acres granted by the treaties of 1760 and 1763. In exchange South Carolina promised to spend $5,000 to acquire a new reservation, $2,500 cash in hand, and yearly payments of $1,500 for nine years. The United States was not a party to and did not participate in the Treaty of Nation Ford.
 
 
 5
 In 1842 South Carolina purchased a 630 acre tract for $2,000 as a new reservation for the Tribe. This land continues to be held in trust for the Tribe by South Carolina as an Indian reservation.[3]
 
 
 6
 In the early 1900s, the Tribe sought to have the federal government assume responsibility for its welfare. These efforts resulted in a 1943 Memorandum of Understanding between the Tribe, the federal government, and South Carolina.[4] In accordance with this agreement, the state purchased 3,434 acres of land and conveyed it in trust for the Tribe to the United States. In addition, the United States agreed to provide economic development assistance to the Tribe, and the Tribe agreed to organize to conduct its business on the basis of the federal government's recommendations.
 
 
 7
 With the advent of the termination era in 1953,[5] the federal government designated the Tribe as a likely candidate for the withdrawal of federal services. Federal assistance during the previous decade had been minimal. In addition, members of the Tribe desired an end to federal restrictions on alienation in order to facilitate financing for farm operations, homes, and improvements on the 3,434 acre reservation.
 
 
 8
 Efforts at securing the withdrawal of federal services began in earnest in 1958 and resulted in the enactment in 1959 of the Catawba Indian Tribe Division of Assets Act.[6] The Act became effective in 1962, and the 3,434 acre reservation, which had been acquired pursuant to the 1943 Memorandum of Understanding, was distributed among tribal members, either as land or as proceeds from its sale.
 
 II
 
 9
 In 1980 the Tribe brought suit against South Carolina and the other defendants. It claims it acquired a vested property right in the 144,000 acre reservation granted the Tribe in the 1760 and 1763 treaties and that upon our nation's independence these lands came within the scope of the federal program for the protection of Indian lands. Consequently, the Tribe asserts the 1840 Treaty of Nation Ford, whereby South Carolina purported to acquire the 144,000 acres, is void because the United States did not participate in or consent to the alienation of the Tribe's reservation as required by the Indian Nonintercourse Act.[7] The Tribe seeks to be restored to possession of its reservation as well as trespass damages for the entire period of its dispossession.
 
 
 10
 South Carolina argues the 1959 act of Congress bars the Tribe's claim. It contends that Sec. 935[8] terminates the Tribe, ends any trust relationship between the Tribe and the federal government, and makes state law applicable to the Tribe's claim. The state also argues that the legislative history supports this interpretation and indicates Congress intended to ratify the 1840 Treaty.
 
 
 11
 The Tribe counters by arguing that Sec. 935 on its face only terminates federal services to the tribe and makes state law applicable to the individual Indians, not to tribal claims. Furthermore, it argues the text and legislative history indicate Congress only intended to end the federal relationship with the Tribe created by the 1943 Memorandum of Understanding and did not intend to affect any tribal claims arising out of the 1760 and 1763 treaties.
 
 
 12
 On cross-motions for summary judgment, the district court assumed, without deciding, that prior to 1959 the Tribe was a "tribe" within the meaning of the Nonintercourse Act; that the 1760 and 1763 treaties granted the Tribe some interest in the land in issue; that the land was covered by the Nonintercourse Act; and that prior to 1959 the United States neither approved, ratified, nor consented to the 1840 Treaty of Nation Ford. The court also assumed that a trust relationship existed between the Tribe and the United States at least up to 1959.
 
 
 13
 The district court granted South Carolina's motion for summary judgment. It held that the 1959 Act extinguished the Tribe's existence; ratified the 1840 treaty; terminated the trust relationship between the Tribe and the federal government; and made state law applicable to the Tribe's claim. It then held that the state statute of limitations barred the claim.
 
 III
 
 14
 In Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 667-68, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974), the Supreme Court reiterated the nation's policy with respect to lands occupied by Indians:
 
 
 15
 It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign--first the discovering European nation and later the original States and the United States--a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land.... The United States also asserted the primacy of federal law in the first Nonintercourse Act passed in 1790, 1 Stat. 137, 138, which provided that "no sale of lands made by any Indians ... within the United States, shall be valid to any person ... or to any state ... unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." This has remained the policy of the United States to this day. (footnote omitted)
 
 
 16
 To establish a prima facie case for a violation of the Nonintercourse Act, the Tribe must prove four elements: (1) that it is or represents an Indian tribe within the meaning of the Nonintercourse Act; (2) that the land in issue is covered by the Nonintercourse Act as tribal land; (3) that the United States has never approved or consented to the alienation of the tribal land; and (4) that the trust relationship between the United States and the tribe, established by coverage of the Nonintercourse Act, has never been terminated or abandoned. Epps v. Andrus, 611 F.2d 915, 917 (1st Cir.1979); Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp., 418 F.Supp. 798, 803 (D.R.I.1976).
 
 
 17
 The district court assumed these elements existed until the enactment of the Catawba Indian Tribe Division of Assets Act of 1959. Thus, the principal issue is whether the 1959 Act precludes the Tribe from relying on the Nonintercourse Act and subjects its claim to the South Carolina statute of limitations.IV
 
 
 18
 In considering the effect of the 1959 Act on the Tribe's claim, we must be mindful of the canons of construction the Supreme Court has enunciated for use in construing statutes that affect Indian tribes. Such statutes should not be construed to the Indians' prejudice. Congressional intent to abrogate or modify a treaty right must be clearly expressed, and doubtful expressions are to be resolved in favor of the Indians. See Antoine v. Washington, 420 U.S. 194, 199-200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975); Mattz v. Arnett, 412 U.S. 481, 504-05, 93 S.Ct. 2245, 2257-58, 37 L.Ed.2d 92 (1973); Menominee Tribe of Indians v. United States, 391 U.S. 404, 412-13, 88 S.Ct. 1705, 1710-11, 20 L.Ed.2d 697 (1968).
 
 
 19
 Both sides present plausible arguments to support their reading of the 1959 Act in which they rely in part on the Act's legislative history in order to discern Congress's intent. We conclude that it is appropriate to examine the legislative history and surrounding circumstances in order to construe the Act properly. See Mattz v. Arnett, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).
 
 
 20
 The process toward passage began in late 1958 when Bureau of Indian Affairs officers met tribal members. An Indian expressed concern about the Tribe's treaty reservation claim against South Carolina, but the Bureau officer assured him "that any claim the Catawbas had against the State would not be jeopardized by carrying out a program with the Federal Government" for the distribution of tribal assets.[9] In January 1959, the Tribe adopted a resolution, drafted by the Bureau, which requested the removal of federal restrictions on their 3,434 acre reservation. The resolution specifically conditioned tribal support of division of assets legislation on leaving the treaty reservation claim unaffected:
 
 
 21
 Now, therefore, BE IT RESOLVED that, in view of the benefits that will accrue to all of the members of the tribe by the equitable distribution of the tribal assets, its General Council ... hereby formally requests [our Congressman] to introduce and secure passage of appropriate legislation to accomplish the removal of Federal restrictions against the alienation of Catawba land, in York County, South Carolina, so that it can be patented, ... and that nothing in this legislation shall affect the status of any claim against the State of South Carolina by the Catawba Tribe. (emphasis added)
 
 
 22
 The Congressman then requested the Bureau to draft legislation "to accomplish the desires set forth in the Resolution."[10] The Congressman presented the draft bill to the Tribe two months later, again saying it "carr[ied] out the intent of the resolution."[11] The Tribe then approved the bill and it was introduced in Congress on April 7, 1959.
 
 
 23
 The House and Senate committee reports on the bill are similar. Both state: "The purpose of [the bill] is to provide for the division of the assets of the Catawba Indian Tribe of South Carolina among its enrolled members in approximately equal shares."[12] In addition, the reports quote from a Department of the Interior recommendation which states:In accordance with the [1943] memorandum of understanding, the State bought 3,434.3 acres of land for the Catawbas and ... conveyed the land to the United States in trust for the tribe. It is this land and the accumulated assets from operating it that will be conveyed under the provisions of the bill.[13]
 
 
 24
 The bill was signed by President Eisenhower on September 21, 1959, and became effective in 1962. At that time, the Department of the Interior informed the Tribe of the revocation of its constitution, the transfer of jurisdiction to the state, and the termination of the 1943 Memorandum of Understanding.[14]
 
 
 25
 Viewed in its entirety, we believe the legislative history of the 1959 Act fails to suggest any congressional intent to affect any claim the Tribe might have against South Carolina. Rather, the legislative history and text of the Act indicate it was intended only to end federal supervision and assistance arising out of the 1943 Memorandum of Understanding. Although the House and Senate reports show Congress was aware of the 1840 Treaty, there is no explicit or implicit indication of any desire to extinguish any tribal claims against South Carolina. In fact, the Act's history suggests a congressional intent not to affect any such claims. The Tribe conditioned introduction of the Act on leaving the treaty reservation claim unaffected, and the Act's congressional sponsor stated it was designed to accomplish the Tribe's desires as expressed in the tribal resolution.
 
 
 26
 We therefore cannot accept the district court's interpretation of the 1959 Act as ratifying the 1840 Treaty. The Act does not expressly ratify it. There also is no mention of the 1760 and 1763 Treaties, by which the Tribe received the 144,000 acres in issue. Thus, the district court's construction of the Act is contrary to the requirement that congressional intent to terminate a treaty reservation must be clear. See DeCoteau v. District County Court, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975).
 
 V
 
 27
 Essential elements of a cause of action under the Nonintercourse Act are proof that the complainant is an Indian tribe and that it has maintained a trust relationship with the federal government. The district court assumed that the Catawbas satisfied these requirements before 1959, but it concluded that the Division of Assets Act terminated the Tribe's existence. The court also held that the Act terminated the Tribe's trust relationship with the federal government with respect to the Nonintercourse Act. In support of the district court's decision, South Carolina emphasizes that the 1959 Act revoked the Tribe's constitution.
 
 
 28
 The authoritative commentary, Cohen, Federal Indian Law 815 (1982), explains the effect of termination on tribal status:
 
 
 29
 Termination legislation did not literally terminate the existence of the affected tribes. Further, its effect was not necessarily to terminate all of the federal government's relationship with those tribes. Tribal powers can be extinguished only by clear and specific congressional action. Indian tribes can be recognized by the United States for some purposes and not for others. (footnotes omitted)
 
 
 30
 Cohen's explanation is fully supported by cases that have considered this issue. See, e.g., Menominee Tribe of Indians v. United States, 388 F.2d 998, 1000-01, 179 Ct.Cl. 496 (1967), aff'd, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) (by implication); Kimball v. Callahan, 590 F.2d 768, 773-75 (9th Cir.1979).
 
 
 31
 Revocation of the Tribe's constitution did not terminate the Tribe. The tribal constitution was adopted pursuant to 25 U.S.C. Sec. 476[15] and the 1943 Memorandum of Understanding. Its revocation is consistent with the termination of federal assistance arising out of that Memorandum. As we mentioned in note 4, supra, the federal government on advice of the Solicitor of the Department of Interior refused to include a clause in the 1943 Memorandum of Understanding that would have extinguished any claims the Tribe might have based on the 1760 and 1763 treaties. The constitution was adopted to implement the Memorandum of Understanding. Consequently, it would be illogical, and indeed ironic, to hold, as South Carolina urges, that Congress intended revocation of the constitution to defeat the same treaty claims that the parties to the Memorandum of Understanding had refused to extinguish.
 
 
 32
 The Supreme Court has defined a "tribe" as "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory ...." Montoya v. United States, 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901). The Court has applied this definition to bring within the scope of the Nonintercourse Act a tribe of Indians that did not have a federally recognized form of government. See United States v. Candelaria, 271 U.S. 432, 441-42, 46 S.Ct. 561, 562-63, 70 L.Ed. 1023 (1926). See also Cohen, Federal Indian Law 18 (1982) ("any continuing organization, however informal, would deny the abandonment of tribal existence"). Despite revocation of the tribal constitution, the Catawba Tribe continued as a body of Indians, united in a community under one leadership, and inhabiting a particular territory. Indeed, South Carolina to this date recognizes the Tribe's existence by continuing to hold a 630 acre reservation in trust for it.[16]
 
 
 33
 Any doubt about the effect of the 1959 Act on the Tribe's existence is put to rest by reference to its text. The Act provides for a final roll of the membership of the Tribe for the disposition of its assets. It authorizes the tribal council to designate any part of the Tribe's land that is to be set aside for church, park, playground, or cemetery purposes. 25 U.S.C. Secs. 931 and 933. Furthermore, it provides that nothing in the Act shall affect the rights, privileges, and obligations of the Tribe under the laws of South Carolina. 25 U.S.C. Sec. 936. Clearly, the Congress did not intend the Division of Assets Act of 1959 to end the Tribe's existence.
 
 
 34
 We also hold that the 1959 Act did not end the trust relationship between the Tribe and the federal government. The res of this trust is the Tribe's reservation, which was created by the Treaty of Pine Tree Hill in 1760 and the Treaty of Augusta in 1763 with the English Crown. When the Nonintercourse Act was enacted some 27 years later, these treaties were in effect. The Tribe's right of occupancy, conferred by the treaties, was honored by the United States which had succeeded to the rights claimed by the English Crown, and the Tribe's right of occupancy could be abrogated only by the federal government. Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 667-70, 94 S.Ct. 772, 777-78, 39 L.Ed.2d 73 (1974); United States v. Santa Fe Pacific R.R., 314 U.S. 339, 345-47, 62 S.Ct. 248, 251-52, 86 L.Ed. 260 (1941); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832); Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 586, 5 L.Ed. 681 (1823).
 
 
 35
 The purpose of the Nonintercourse Act was to assert the primacy of federal law and to acknowledge and guarantee the Tribe's rights of occupancy to their lands. See Oneida Indian Nation, 414 U.S. at 667, 94 S.Ct. at 777; Santa Fe Pacific R.R., 314 U.S. at 348, 62 S.Ct. at 252. The Nonintercourse Act creates a trust or fiduciary relationship between the federal government and the tribe somewhat akin to the relationship of guardian and ward. Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 379 (1st Cir.1975). Passamaquoddy establishes that a trust relationship created by the Nonintercourse Act exists even though federal officials charged with supervision of Indian Affairs disclaim any responsibility for the Tribe. Passamaquoddy also establishes that the absence of federally recognized tribal government and the exercise of state jurisdiction over a tribe and its members neither dissolves the trust relationship arising out of the Nonintercourse Act nor renders the Act inapplicable to the tribe's claims.
 
 
 36
 Congress, of course, may terminate the trust relationship, thus abrogating the federally recognized right of the tribe to its occupancy of reservation lands, but its intention to do so must be plain and unambiguous to be effective. See DeCoteau v. United States, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975); Santa Fe Pacific R.R., 314 U.S. at 346, 62 S.Ct. at 251; Passamaquoddy, 528 F.2d at 380. Doubtful expressions of legislative intent must be resolved in favor of the Indians. DeCoteau, 420 U.S. at 444, 95 S.Ct. at 1092.
 
 
 37
 In support of its contention that the Division of Assets Act of 1959 terminated both the existence of the Tribe and its trust relationship with the federal government, South Carolina particularly relies on the clause in 25 U.S.C. Sec. 935 which provides:
 
 
 38
 [T]he Tribe and its members shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction.
 
 
 39
 South Carolina argues that this provision included the withdrawal of the protection conferred on the Tribe by the Nonintercourse Act. The Catawbas insist that this provision of the 1959 Act applies only to individual Indians and not to the Catawba Tribe. The applicability of the Nonintercourse Act to the rights of the Tribe, they assert, was not affected.
 
 
 40
 The legislative histories of both the Nonintercourse Act and the 1959 Act, and Supreme Court precedent, support the position of the Catawbas. Although the terms "Indians" and "Indian tribes" frequently have been used interchangeably in various contexts, the distinction is critical when the application of the Nonintercourse Act is an issue. Initially the Act applied to both Indians and Indian tribes. Later, however, Congress deleted the reference to Indians. See 4 Stat. 730-31 (1834). Henceforth, the Nonintercourse Act afforded protection only to the lands of Indian tribes. We do not feel free to assume that Congress was unaware of this distinction. We cannot attribute to Congress an intention to bar by the 1959 Act the Catawba's claim to tribal lands. By providing that "all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them," we conclude that Congress did not intend to render inapplicable the Nonintercourse Act which by its terms applied to Indian tribes. As we have pointed out, the Catawbas had been assured by a representative of the Bureau of Indian Affairs and the congressional sponsor of the 1959 Act that their resolve to preserve their claims against South Carolina would not be affected by the Act. We will not impute to Congress an intent to circumvent these assurances by implicitly enlarging the term "Indians" to embrace the "Catawba Indian Tribe."
 
 
 41
 Precedent supporting the Catawbas is found in Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). In that case the question arose whether the Menominee Termination Act of 1954 abrogated the Tribe's fishing and hunting rights conferred by a treaty in 1854. The Court held that the Act did not have this effect, saying at 412-413, 88 S.Ct. at 1710-1711:The Termination Act by its terms provided for the "orderly termination of Federal supervision over the property and members" of the tribe. 25 U.S.C. Sec. 891. (Emphasis added.) The Federal Government ceded to the State of Wisconsin its power of supervision over the tribe and the reservation lands, as evident from the provision of the Termination Act that the laws of Wisconsin "shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within [its] jurisdiction."
 
 
 42
 The provision of the Termination Act (25 U.S.C. Sec. 899) that "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe" plainly refers to the termination of federal supervision. The use of the word "statutes" is potent evidence that no treaty was in mind.
 
 
 43
 We decline to construe the Termination Act as a back-handed way of abrogating the hunting and fishing rights of these Indians. While the power to abrogate those rights exists ... "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress."
 
 
 44
 There is no explicit or clear implicit indication in the 1959 Act that Congress intended to terminate the relationship arising out of the Nonintercourse Act's application to the lands granted by the 1760 and 1763 Treaties. Furthermore, in at least one similar act, Congress clearly terminated the federal trust relationship with respect to the affected tribe, something it did not do in the 1959 Act. Compare 25 U.S.C. Sec. 935 (Catawba Tribe, no explicit termination) with 25 U.S.C. Sec. 980 (Ponca Tribe, explicit termination).
 
 VI
 
 45
 Having concluded that the 1959 Act made the South Carolina statute of limitations applicable to the Tribe's claim, the district court went on to hold that the state statute barred the claim.
 
 
 46
 Section 936 explicitly provides that nothing in the Act shall affect the rights of the Tribe under the laws of South Carolina.[17] For the purpose of the summary judgment entered by the district court, it was assumed that prior to the enactment of the Division of Assets Act in 1959 the South Carolina statute of limitations did not affect the right of the Tribe to claim its tribal reservation. Consequently, it is incongruous to say, despite Sec. 936, that the 1959 Act did affect this right by allowing application of the state statute of limitations to bar the claim. Yet this is precisely what the district court did through its interpretation of the 1959 Act.[18] The 1959 Act neither prohibits nor authorizes the application of state law to bar the Tribe's reservation claim.
 
 
 47
 We cannot accept the district court's interpretation of the 1959 Act. Consequently, its decision that the state statute of limitations bars the Tribe's claim must be set aside. The Nonintercourse Act and the supremacy clause preempt state law defenses, such as adverse possession or statutes of limitation, which might otherwise preclude the Tribe's suit. See Mohegan Tribe v. Connecticut, 638 F.2d 612, 614-15 (2d Cir.1981); United States v. 7,405.3 Acres of Land, 97 F.2d 417, 422 (4th Cir.1938).
 
 VII
 
 48
 We conclude that the Catawba Indian Tribe Division of Assets Act of 1959 did not ratify the 1840 Treaty, extinguish the Tribe's existence, terminate the trust relationship of the Tribe with the federal government arising out of the Nonintercourse Act, or make the state statute of limitations applicable to the Tribe's claim. In short, the 1959 Act is neutral with respect to the Tribe's reservation claim. It neither confirms the claim nor extinguishes it.
 
 
 49
 The judgment of the district court is reversed, and the case is remanded for entry of an order denying the defendants' motion for summary judgment and for further proceedings consistent with this opinion.
 
 K.K. HALL, Circuit Judge, dissenting:
 
 50
 I cannot accept the majority's conclusion that the district court erred in granting defendants' motion for summary judgment and in dismissing plaintiff's action. In my view, the 1959 Catawba Indian Tribe Division of Assets Act, 25 U.S.C. Sec. 931 et seq., unquestionably terminated the Tribe's legal existence, ended any trust relationship between the Catawbas and the federal government, and made South Carolina law fully applicable to whatever claim plaintiff may have had to the Tribe's ancestral land. I agree with the district court that plaintiff's claim, if valid at all, is in any event barred by South Carolina's statute of limitations governing real property. I must, therefore, dissent.
 
 
 51
 Plaintiff in this case, a non-profit corporation, alleges that it is the successor to the Catawba Indian Tribe and that, as such, it has an ownership interest in approximately 144,000 acres of land in three South Carolina counties. According to the record, however, by 1840, the Catawbas had leased to white settlors all of the 144,000 acres now in dispute.[1] In 1840, the Catawbas entered into an agreement with the State of South Carolina, known as the Treaty of Nation Ford, in which they gave up any remaining interest they had in the 144,000 acres. Now, by seeking to defeat this 1840 transaction, plaintiff requests relief which would destroy the titles of more than 27,000 South Carolina citizens. In light of this history and because of the provisions of the Catawba Act, it is clear to me that plaintiff's claim to the Tribe's ancestral land must fail.
 
 
 52
 Unlike the majority, I am convinced that the central purpose of the Catawba Act was to terminate federal responsibility to the Tribe and its individual members. Partial termination was specifically rejected by the bill's sponsor and the Catawbas, who voted in favor of complete termination. Furthermore, the plain and far-reaching language of the Act clearly reflects congressional intent to terminate any special federal status the Catawbas may previously have held and to put them on an equal footing with other citizens. To this effect, the Act even includes a provision which revokes the tribe's constitution. Under Section Five of the Catawba Act, 25 U.S.C. Sec. 935:
 
 
 53
 The constitution of the tribe adopted pursuant to ... this title shall be revoked by the Secretary. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction. Nothing in this subchapter, however, shall affect the status of such persons as citizens of the United States. (Emphasis added).
 
 
 54
 Section 6 of the Catawba Act, 25 U.S.C. Sec. 936, similarly provides that "[n]othing in this subchapter shall affect the rights, privileges, or obligations of the tribe and its members under the laws of South Carolina." (Emphasis added).
 
 
 55
 In my view, the revocation of the Tribe's constitution unequivocally ended the Catawbas' existence as a political or governmental entity under federal law and prevents plaintiff from having the necessary standing to bring this action under the Nonintercourse Act. As the majority opinion correctly notes, there are four prerequisites to establishing a prima facie case under the Nonintercourse Act. Epps v. Andrus, 611 F.2d 915, 917 (1st Cir.1979). One of these requirements is that plaintiff show that it is or represents an Indian tribe. In my view, the revocation of the Tribe's constitution makes it impossible for plaintiff to establish this necessary element of a prima facie case. Furthermore, the revocation of the Catawbas' tribal constitution terminated the trust relationship between the Tribe and the United States, rendering it impossible for plaintiff to meet yet another prerequisite to a prima facie case under the Nonintercourse Act. Because plaintiff can establish neither of these requirements, its claim under the Nonintercourse Act is fatally defective.
 
 
 56
 Moreover, the explicit statutory language of Sections 5 and 6 of the Catawba Act makes it clear that the legislation was intended to accord the Catawbas the same privileges and responsibilities as other South Carolina citizens. Thus, from the time the tribe's constitution was revoked on July 1, 1962, the Catawbas, and any federal claim they might have then had, were subject to the operation of state law in the same manner as all other citizens of South Carolina and their claims.
 
 
 57
 One of the laws that became applicable to the Catawbas in 1962 was South Carolina's statute of limitations governing real property claims. S.C.Code Sec. 15-3-340 states in pertinent part that "[n]o action for the recovery of real property or for the recovery of the possession thereof shall be maintained unless it appear that the plaintiff, his ancestor, predecessor or grantor, was seized or possessed of the premises in question within ten years before the commencement of such action." Thus, even if the Catawba Act did not extinguish the Catawbas' claim to the land which their ancestors had long since alienated, this suit, brought some 18 years after the statute of limitations had begun to run, is unquestionably time-barred.
 
 
 58
 The application of South Carolina's statute of limitations in this case is entirely consistent with Supreme Court precedent. In Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court's most recent decision construing a termination act, terminated Indians were required to challenge allegedly fraudulent transfers of property under the same laws as non-Indians. In an earlier decision, Schrimpscher v. Stockton, 183 U.S. 290, 22 S.Ct. 107, 46 L.Ed. 203 (1901), Indian heirs sued to recover land conveyed by a Wyandotte Indian at a time when alienation was prohibited by federal treaty. In light of a subsequent treaty, which had terminated such restrictions, the Supreme Court held that the state statute of limitations had run, precluding recovery:
 
 
 59
 Their disability terminated with the ratification of the treaty of 1868. The heirs might then have executed a valid deed of the land, and possessing, as they did, an unincumbered [sic] title in fee simple, they were chargeable with the same diligence in beginning an action for their recovery as other persons having title to lands; in other words, they were bound to assert their claims within the period limited by law. This they did not do under any view of the statute, (whether the limitation be three or fifteen years), since it began to run at the date of the treaty, 1868, and the action was not brought until 1894, a period of over twenty years. Id. at 296, 22 S.Ct. at 110. (Emphasis added).
 
 
 60
 See also, Dillon v. Antler Land Co., 341 F.Supp. 734 (D.Mont.1972), aff'd 507 F.2d 940 (9th Cir.1974), cert. denied, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975); Dennison v. Topeka Chambers Industrial Development Corp., 527 F.Supp. 611 (D.Kan.1981) (both holding that state statutes of limitations begin to run once restrictions are removed and state law is made applicable).[2]
 
 
 61
 As the Tenth Circuit noted in Reyos v. United States, 431 F.2d 1337, 1343 (10th Cir.1970), aff'd in part and rev'd in part, Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), "[i]t is not for administrative officials or for the courts to modify this statutory termination by the creation of some status lying between wardship and complete termination." I submit that the majority in this case has impermissibly substituted its own judgment for that of Congress. By doing so, it has succeeded in nullifying the clear mandate of the Catawba Act and has placed in jeopardy the long-established rights of over 27,000 South Carolina citizens. Because I believe the district court was correct in dismissing plaintiff's action, I would affirm the judgment below.
 
 
 
 [1]
 For convenience, we will refer to the appellees collectively as South Carolina
 
 
 [2]
 The 1763 Treaty of Augusta provides in relevant part:
 And We the Catawba Head Men and Warriors in Confirmation of an Agreement heretofore entered into with the White People declare that we will remain satisfied with the Tract of Land of Fifteen Miles square a Survey of which by our consent and at our request has been already begun and the respective Governors and Superintendent on their Parts promise and engage that the aforesaid survey shall be compleated and that the Catawbas shall not in any respect be molested by any of the King's subjects within the said Lines but shall be indulged in the usual Manner of hunting Elsewhere.
 XI Colonial Records of North Carolina, at 201-02. The tract lies at the northern border of South Carolina in York, Lancaster, and perhaps Chester counties. The precise boundaries are uncertain because of the deficiencies of the survey.
 
 
 [3]
 See Op. Att'y Gen. S.C., No. 3988 (Mar. 6, 1975)
 
 
 [4]
 The federal government refused to include a clause in the 1943 Memorandum that would have specifically extinguished any claims the Tribe might have based on the 1760 and 1763 treaties. In a "formal expression of opinion," the solicitor of the Department of the Interior stated that elimination of the clause was "most desirable in that it avoids a procedure of doubtful legality which would have consisted in using a contract under the Johnson-O'Malley Act in order to deprive the Indian tribe of claims which it might be able to enforce in the courts." Memorandum for the Commissioner of Indian Affairs from the Solicitor of the Department of the Interior, undated, at 3. See also Letter of the Assistant Commissioner of Indian Affairs to the State Auditor of South Carolina, dated Aug. 28, 1941
 
 
 [5]
 "Termination era" refers to the federal policy from 1953 to the mid-1960s of ending the federal government's supervisory responsibilities for Indian tribes. See F. Cohen, Handbook of Federal Indian Law 152-80 (R. Strickland ed. 1982) [cited as Cohen, Federal Indian Law (1982) ]
 
 
 [6]
 73 Stat. 592, 25 U.S.C. Secs. 931-938. The Act provides for the preparation of a tribal membership roll, the tribal council's designation of sites for church, park, playground, and cemetery purposes, and the division of remaining assets among the enrolled members of the tribe
 Sections 935 and 936, with which this litigation is particularly concerned, provide:
 Sec. 935. The constitution of the tribe adopted pursuant to sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be revoked by the Secretary. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction. Nothing in this subchapter, however, shall affect the status of such persons as citizens of the United States.
 Sec. 936. Nothing in this subchapter shall affect the rights, privileges, or obligations of the tribe and its members under the laws of South Carolina.
 
 
 [7]
 25 U.S.C. Sec. 177 (originally enacted as Act of July 22, 1790, ch. 33, Sec. 4, 1 Stat. 138). The Act states in relevant part: "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."
 Transactions in violation of the Nonintercourse Act are void. Cohen, Federal Indian Law 512 (1982).
 
 
 [8]
 See supra note 6
 
 
 [9]
 Memorandum of Jan. 30, 1959, from a Program Officer to the Chief of the Branch of Tribal Programs of the Bureau of Indian Affairs, at 7
 For a number of years, South Carolina and the Tribe have unsuccessfully negotiated to settle the Tribe's claim. See, e.g., Letter from the Assistant Commissioner of the Bureau of Indian Affairs to the Chief of the Catawba Tribe, dated Feb. 3, 1937; Letter from the Assistant Commissioner of the Bureau of Indian Affairs to the State Auditor of South Carolina, dated Feb. 3, 1937. See generally U.S. Comm'n on Civil Rights, Indian Tribes 117-18 (1981).
 
 
 [10]
 Letter from the Congressman to the Legislative Associate Commissioner of the Bureau of Indian Affairs, dated January 26, 1959
 
 
 [11]
 Minutes of Meeting of the Catawba Council held March 28, 1959, at 2
 
 
 [12]
 S.Rep. No. 863, 86th Cong., 1st Sess. 1 (1959); H.R.Rep. No. 910, 86th Cong., 1st Sess. 1 (1959), reprinted in 1959 U.S.Code Cong. & Ad.News 2671, 2672
 
 
 [13]
 S.Rep. No. 863, 86th Cong., 1st Sess. 3 (1959); H.R.Rep. No. 910, 86th Cong., 1st Sess. 3 (1959), reprinted in 1959 U.S.Code Cong. & Ad.News 2671, 2673
 
 
 [14]
 See Letter from the Secretary of the Department of the Interior to the Chief of the Catawba Tribe, dated June 15, 1962
 
 
 [15]
 "Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws ...."
 This provision was enacted in order to encourage revitalization of tribal self-government through the adoption of more formal governmental procedures. See Mescalero Apache Tribe v. Jones, 411 U.S. 145, 151-52, 93 S.Ct. 1267, 1271-72, 36 L.Ed.2d 114 (1973).
 
 
 [16]
 See supra note 3 and accompanying text
 
 
 [17]
 See supra note 6
 
 
 [18]
 The district court held:
 Because [Sec. 935] of the Catawba Act explicitly made state law applicable to the Catawbas and the termination of the trust relationship accomplished the same result, South Carolina's statute of limitations began to run against any claim the Catawbas or the plaintiff may have had on July 1, 1962, the date the Catawbas' constitution was revoked.
 
 
 [1]
 The 1763 Treaty of Augusta, entered into between the Tribe and the representatives of the King of England, in which the Catawbas agreed to be settled on the 144,000-acre tract, contained no restrictions on alienating this property
 
 
 [2]
 The majority's reliance on the Supreme Court's decision in Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), is misplaced. In Menominee, the tribal constitution was not revoked, as in the present case. Furthermore, the hunting and fishing rights, which were the subject of the Menominees' claim, had never been alienated. In this case, the Catawbas have not occupied the property in question for more than 180 years