740 F.2d 305
 CATAWBA INDIAN TRIBE OF SOUTH CAROLINA, also known as the
Catawba Nation of South Carolina,
v.
STATE OF SOUTH CAROLINA, Richard W. Riley, as Governor of
the State of South Carolina; County of Lancaster, and its
County Council consisting of Francis L. Bell as Chairman,
Fred E. Plyler, Eldridge Emory, Robert L. Mobley, Barry L.
Mobley, L. Eugene Hudson, Lindsay Pettus; City of Rock
Hill, J. Emmett Jerome, as Mayor, and its City Council
consisting of Melford A. Wilson, Elizabeth D. Rhea, Maxine
Gill, Winston Searles, A. Douglas Echols, Frank W. Berry,
Sr.; Bowater North American Corporation; Catawba Timber
Co.; Celanese Corporation of America; Citizens and
Southern National Bank of South Carolina; Cresent Land &
Timber Corp.; Duke Power Company; Flint Realty and
Construction Company; Herald Publishing Company; Home
Federal Savings and Loan Association; Rock Hill Printing &
Finishing Company; Roddey Estates, Inc.; Southern Railway
Company; Springs Mills Inc.; J.P. Stevens & Company; Tega
Cay Associates; Wachovia Bank and Trust Company; Ashe
Brick Company; Church Heritage Village & Missionary
Fellowship; Nisbet Farms, Inc.; C.H. Albright; Ned
Albright; J.W. Anderson, Jr.; John Marshall Wilkins, II;
Jesse G. Anderson; John Wesley Anderson; David Goode
Anderson; W.B. Ardrey, Jr.; Eliza Beth Ardrey Grimball;
John W. Ardrey, Ardrey Farms; F.S. Barnes, Jr.; W. Watson
Barron; Wilson Barron; Archie B. Carroll, Jr.; Hugh
William Close; James Bradley; Francis Lay Springs;
Lillian Crandel Close; Francis Allison Close; Leroy
Springs Close; Patricia Close; William Elliot Close; Hugh
William Close, Jr.; Robert A. Fewell; W.J. Harris; Annie
F. Harris; T.W. Hutchinson; Hiram Hutchinson, Jr.; J.R.
McAlhaney; F.M. Mack, Jr.; Arnold F. Marshall; J.E.
Marshall, Jr.; C.E. Reid, Jr.; Will R. Simpson; John S.
Simpson; Robert F. Simpson; Thomas Brown Snodgrass, Jr.;
John M. Spratt; Marshal E. Walker; Hugh M. White, Jr.;
John M. Belk; Jane Nisbet Goode; R.N. Bencher; W.O.
Nisbet, III; Pauline B. Gunter; J. Max Minson; W.A.
McCorkle; Mary McCorkle; William O. Nisbet; Eugenia
Nisbet White; Mary Nisbet Purvis; E.N. Martin; Robert M.
Yoder, Appellees.
 No. 82-1671.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 4, 1984.
Decided Aug. 17, 1984.
 
 Don B. Miller, Boulder, Colo., and Jean H. Toal, Columbia, S.C. (Native American Rights Fund; Belser, Baker, Barwick, Ravenel, Toal & Bender, Columbia, S.C., Robert M. Jones, Rock Hill, S.C., Mike Jolly and Richard Steele, Union, S.C., on brief), for appellant.
 John C. Christie, Jr., Chicago, Ill., J.D. Todd, Jr., Greenville, S.C., James D. St. Clair, Boston, Mass. (J. William Hayton, Stephen J. Landes, Lucinda O. McConathy, Bell, Boyd & Lloyd, Chicago, Ill., Michael J. Giese, Gwendolyn Embler, Leatherwood, Walker, Todd & Mann, Greenville, S.C., Dan M. Byrd, Jr., Mitchell K. Byrd, Byrd & Byrd, Rock Hill, S.C., James L. Quarles, III, William F. Lee, David H. Erichsen; Hale & Dorr, Boston, Mass., T. Travis Medlock, Atty. Gen., Kenneth P. Woodington, Asst. Atty. Gen. for the State of South Carolina, Columbia, S.C., on brief), for appellees.
 Before WINTER, Chief Judge, WIDENER, HALL, PHILLIPS, MURNAGHAN, and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge. (en banc)*
 PER CURIAM:
 
 
 1
 The judgment of the district court is reversed, and this case is remanded for further proceedings for reasons stated in the opinion of the panel. Catawba Indian Tribe of South Carolina v. South Carolina, 718 F.2d 1291 (4th Cir.1983). Judge Widener, Judge Hall, and Judge Phillips, dissenting, would affirm the judgment of dismissal for the reasons stated in Judge Hall's dissent to the panel opinion. 718 F.2d at 1301-03.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 2
 For the reasons so cogently expressed by Judge Butzner in his opinion for the panel majority, I agree that "the Catawba Indian Tribe Division of Assets Act of 1959 did not ratify the 1840 Treaty, extinguish the Tribe's existence, terminate the trust relationship of the Tribe with the federal government arising out of the Nonintercourse Act, or make the state statute of limitations applicable to the Tribe's claim." Catawba Indian Tribe of South Carolina v. State of South Carolina, 718 F.2d 1291, 1300 (4th Cir.1983).[1] While the dissent has delivered a respectable argument to the contrary, we face at most a case in which the congressional statement is open to dual interpretations. We may, however, permit only a plain and unambiguous expression of congressional intent to abrogate a federally recognized right and terminate a trust relationship. Furthermore, construction of statutes affecting Indian tribes should proceed on the basis of tender concern for the rights of Indians. The uncertainty in statutory interpretation in the instant case is properly resolved in favor of the Catawba Tribe.
 
 
 3
 I therefore unreservedly join in the opinion of Judge Butzner, reversing the award of summary judgment in favor of South Carolina. As for the other defendants, landowners of parcels compositely comprising the 144,000 acres, no arguments separate and distinct from those advanced on behalf of the State of South Carolina have been made, and, consequently, on the present state of the record I also agree that summary judgments in their favor should be reversed.
 
 
 4
 My concurrence with respect to the private defendants, however, is a troubled one. Since the Tribe's claim at present includes the right to actual possession, a complete victory for the Catawba Tribe would leave up in the air or by the side of the road the approximately 27,000 people claiming title through deeds or other sources to the 144,000 acres. It appears to be a tacit assumption that ejectment would never be allowed actually to occur, even were we in the end to validate continued vitality of the Indian title to the 144,000 acres. Rather, through accommodation between the Indians and either or both of the United States and the State of South Carolina, the Catawba Tribe would relinquish all possessory claims in return for money or other benefits.
 
 
 5
 For myself, I take little solace in the consideration that a proper, fair and equitable result may possibly come about by reason of enlightened, but by no means mandatory, legislative or executive action. Such a posture would still leave too many innocent good faith landowners at an awesome risk that political realities related to efforts by both sovereigns to right a long standing wrong, might lead to the Queen of Spades ultimately winding up in the hands of the individual owners.
 
 
 6
 While I therefore harbor grave doubts, that, as a matter of grace, a government will rescue the current occupants of the land, I take greater comfort in the realization that there may be available on remand an argument that would at once retain the vitality of the claims of the Catawba Tribe and also afford protection to the innocent, private landowners.[A]s the Supreme Court held in Yankton Sioux Tribe v. United States, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926), if the ejectment of current occupants and the repossession by the Indians of a wrongfully taken land is deemed an "impossible" remedy, id. at 357, 47 S.Ct. at 143, the court has authority to award monetary relief for the wrongful deprivation. Id. at 359, 47 S.Ct. at 144.
 
 
 7
 Oneida Indian Nation of New York v. State of New York, 691 F.2d 1070, 1083 (2nd Cir.1982). In reaching its result, the Yankton court expressed its concerns for the plight of the innocent landowners:
 
 
 8
 It is impossible, however, to rescind the cession and restore the Indians to their former rights because the lands have been opened to settlement and large portions of them are now in the possession of innumerable innocent purchasers ....
 
 
 9
 Yankton Sioux Tribe v. United States, supra, at 357, 47 S.Ct. at 144. The court concluded that, since the Indians were entitled to a judgment in their favor, but a restoration of the lands to the Indians was an impossible remedy, the Indians were "entitled to just compensation as for a taking under the power of eminent domain." Id. at 359,[2] 47 S.Ct. at 144.
 
 
 10
 Under Yankton and Oneida, therefore, one or both of the sovereigns (the United States or South Carolina) may indeed owe to the Tribe just compensation. On that basis, the titles of the 27,000 landowners would be held to be paramount and they, without surrender of the land or payment in cash, would be entitled to judgment. South Carolina's liability might arise from the fact that, assuming that the 1840 Treaty is invalid under the Nonintercourse Act, the state entered into an invalid treaty with the Catawba Tribe and induced innocent landowners to settle on the land. That may be held to translate into an obligation to protect the present occupants or other claimants by paying just compensation to the Catawbas for the land.
 
 
 11
 As for the United States,[3] it remains to be explored whether liability to pay just compensation to the Indians arises, either from the Government's failure to protect their claim to possession despite the special relationship between the United States and the Indians, or from the government's failure to extinguish the Catawba's possessory claims in light of the extensive reliance by the innocent parties on apparently good and clear title.[4]
 
 
 12
 The resolution of the competing claims through the just compensation concept has the great and equitable advantage of protecting the innocent landowners from sustaining monetary injury. Certainly, the two sovereigns, the United States and the State of South Carolina, have done nothing to warn them off the land. To the contrary, the sovereigns have actively encouraged their settlement or the settlement of their predecessors, and, no doubt, have actively benefited through real property and income taxes assessed against the land in their hands or against profits generated by its use.
 
 
 13
 Resolution of the issues raised above is, of course, premature. After remand, it remains possible that one, or both, sovereigns can be stimulated into doing what together they should have done long since. Additionally, the parties may be able to resolve their differences by means wholly apart from those suggested here. The route described is merely one attempt to avoid remedying one inequity by perpetrating another, perhaps greater, one. It would indeed be tragic and unfair for the long-overdue resolution of the Catawba Tribe's claims to occur exclusively and disproportionately at the expense of the more than 27,000 innocent South Carolina citizens with claims to the contested land, more recent in the sense of strict accuracy than those of the Tribe, but long standing in fact, reaching back over 140 years. By our society's general attitude, a title of that uninterrupted duration should be good against the world.
 
 
 
 *
 Judge Russell, Judge Ervin, and Judge Chapman did not participate in the hearing or the decision of this appeal
 
 
 [1]
 Judge Butzner's panel majority opinion is adopted by reference in the per curiam opinion following en banc rehearing. Judge Butzner was joined by Chief Judge Winter, Judge Sprouse, and now by me. The opposing opinion of Judge Hall was joined by Judge Widener and Judge Phillips. It, too, is incorporated by reference in the per curiam opinion
 
 
 [2]
 It is not particularly earthshaking for a court to tailor the remedy to the problem at hand. Monetary relief representing fair value is "just compensation" and constitutionally is the equivalent of tangible or real property. See, e.g., United States v. 564.54 Acres of Land, 441 U.S. 506, 510, 99 S.Ct. 1854, 1856, 60 L.Ed.2d 435 (1979); Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934); United States v. 131.68 Acres of Land, 695 F.2d 872 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 77, 78 L.Ed.2d 88 (1983) ("[T]he government must, and need do no more than, put the owner in '... as good a position pecuniarily as if his property had not been taken.' " Id. at 875, quoting Olson v. United States, supra, 292 U.S. at 255, 54 S.Ct. at 708). The public purpose to justify a taking is not open to serious question. At a bare minimum, present occupants should not be required, because customarily in unitary instances of ejectment the remedy is return of the property itself and not a monetary "substitute," to surrender possession, if just compensation is indeed awarded to the Catawba Tribe
 
 
 [3]
 Nothing should preclude amendment by the Catawba Tribe of its complaint to name the United States as a defendant, thereby presenting the issue for resolution. Similarly, South Carolina might endeavor to raise the question through impleading the federal government
 It would remain to be seen whether either the Catawba Tribe or South Carolina could overcome a likely claim of sovereign immunity raised by the United States. See, e.g., Affiliated Ute Citizens v. United States, 406 U.S. 128, 141-143, 92 S.Ct. 1456, 1466-1467, 31 L.Ed.2d 741 (1972). Cf. Antoine v. United States, 637 F.2d 1177, 1181-82 (11th Cir.1981); Fontenelle v. Omaha Tribe of Nebraska, 430 F.2d 143, 146-147 (8th Cir.1970). See also United States v. Oneida Nation of New York, 477 F.2d 939 (Ct.Cl.1973). It might become necessary to explore the possibility that consent in this instance can be inferred from the Nonintercourse Act, the 1959 Act or even some future legislation Congress may see fit to enact.
 An analogous obstacle to recovery from South Carolina may arise in the Eleventh Amendment context. See, e.g., Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). But cf., Parden v. Terminal Railway, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). See generally, L. Tribe, American Constitutional Law, 129-138 (1978).
 Alternatively, the time may be at hand to decide whether, in the dying writhings of an outmoded concept, time has passed sovereign immunity by if not elsewhere in the absence of legislative consent to be sued, at least in the area of executive and legislative actions relating to relationships at the highest governmental levels such as those between the United States and an Indian tribe.
 Even if sovereign immunity concepts still would preclude in this case recovery against the United States and South Carolina, they concern only a jurisdictional barrier, and do not preclude judicial allocation of rights and responsibilities. If the United States and South Carolina elect to plead sovereign immunity, and therefore to waive the right to appear and assert their positions when a court is determining who owes what to whom, a right of the Catawba Tribe against the sovereigns may no less be asserted and established even if judicially it may not be enforced. The right, outstanding if not realizable by judicial process, may nevertheless be pursued in the halls of the legislatures. It should not lightly be inferred that a government, the best we know and have, will not respond to a valid claim or claims simply because it cannot be compelled to pay.
 The question here remains as to where rights and responsibilities to the land or to compensation for it lie. Legally, the question of who is entitled is not the same as who may enforce in court the entitlement. It remains for a later stage in these proceedings to address potentially far-reaching and tantalizingly fascinating questions.
 
 
 [4]
 It may also become necessary to consider whether cases such as Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 284-5, 75 S.Ct. 313, 319-320, 99 L.Ed. 314 (1955) are distinguishable on the basis that, in those cases, explicit and affirmative action by the Congress, rather than neglect or a failure to act, led to the abrogation of the Indians' possessory claims